RENDERED: DECEMBER 18, 2014
TO BE PUBLISHED

# $\mathfrak{Supreme\ Court\ of\ Kentucky}$

## 2013-SC-000803-MR

FINAL

DATE 1-8-15 ExtGrounPC.

ST. JOSEPH CATHOLIC ORPHAN
SOCIETY, ET AL.

APPELLANTS

ON REVIEW FROM COURT OF APPEALS
V.         CASE NO. 2013-CA-001391-MR
JEFFERSON CIRCUIT COURT NO. 13-CI-0001781

HONORABLE BRIAN C. EDWARDS,                              APPELLEE
JUDGE, JEFFERSON CIRCUIT COURT

AND

ST. JOSEPH HOME ALUMNI ASSOCIATION, ET AL.      REAL PARTIES IN INTEREST

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

## **AFFIRMING DENIAL OF WRIT, REVERSING DENIAL OF MOTION TO DISMISS, AND REMANDING WITH INSTRUCTIONS**

After being removed from their seats on St. Joseph Catholic Orphan

Society's Board of Trustees, certain individuals who also identify themselves as

members of the St. Joseph Home Alumni Association,[1] filed suit against St.

Joseph and the newly-elected Board members.[2] The suit challenges the

---

[1] Robert Beam, Frank Campisano, Milton Hettinger, Jack Fihe, John Straub, Francis Paalz, Billie Satterly, and Charlie Steier along with the St. Joseph Home Alumni Association, are the Appellees, real parties in interest, in this writ proceeding and plaintiffs in the underlying suit. For the sake of brevity, they will be jointly referred to as the "Alumni."

[2] The newly-elected Board members were Thurman Senn, Kelly Henry, James Hillebrand, Barbara Carter, Craig Harbsmeier, and Charles Nopper. They, along with St. Joseph, are the appellants in this action.

validity of the Board's resolution effectuating their removal and seeks reappointment of the ousted members to St. Joseph's Board of Trustees.

St. Joseph sought dismissal of the suit, arguing the trial court was without subject-matter jurisdiction because of the application of the ecclesiastical-abstention doctrine. The trial court denied St. Joseph's motion to dismiss because it found the ecclesiastical-abstention doctrine inapplicable.

St. Joseph is now before this Court seeking a writ of mandamus requiring the trial court to dismiss the underlying action. It again claims the trial court is without subject-matter jurisdiction to hear the Alumni's cause of action because of the application of ecclesiastical abstention. The Court of Appeals, where this writ action originated, declined to issue a writ, concluding ecclesiastical abstention did not apply because the underlying case could be adjudicated on the basis of neutral principles of law. St. Joseph appeals the writ denial to this Court as a matter of right.[3]

Before this Court, St. Joseph contends the Court of Appeals erred in declining to issue a writ because, regardless of the neutrality of the applicable secular law, the underlying suit is one concerning the internal governance of a religious entity. As such, St. Joseph argues, the ecclesiastical-abstention doctrine applies and deprives the circuit court of subject-matter jurisdiction to hear the suit.

---

[3] Kentucky Rules of Civil Procedure (CR) 76.36(7)(a) ("An appeal may be taken to the Supreme Court as a matter of right from a judgment or final order in any proceeding originating in the Court of Appeals."); *see also* Ky. Const. § 115 ("In all cases, civil and criminal, there shall be allowed as a matter of right at least one appeal to another court . . . .").

2

We affirm the denial of a writ by the Court of Appeals, but we do so on other grounds. We conclude the ecclesiastical-abstention doctrine does not divest our courts of subject-matter jurisdiction to hear cases they are otherwise authorized to adjudicate. So the issuance of a writ is improper. Instead, we reason that the ecclesiastical-abstention doctrine is to be applied as an affirmative defense akin to the ministerial exception, including the right to an interlocutory appeal following a trial court's denial of its application. As such and in the interests of judicial economy, we treat St. Joseph's petition for a writ of mandamus as an interlocutory appeal from the trial court's denial of its motion to dismiss based on the ecclesiastical-abstention doctrine. And on the merits of St. Joseph's claim, we agree that the underlying action presents a question of ecclesiastical governance, which means that the ecclesiastical-abstention doctrine prohibits the underlying action from going forward in the trial court. Accordingly, we reverse the trial court's order denying St. Joseph's motion to dismiss, and we remand the case to the trial court with instructions to dismiss the action.

## I. FACTUAL AND PROCEDURAL HISTORY.

### A. We are Constrained to Deny Alumni's Untimely Motion for Enlargement of Time to File a Brief. Without a Brief From the Appellees, we Accept the Appellant's Version of the Facts and Issues.

Before our customary recitation of the circumstances encompassing this case, we must address a pending motion that bears directly on our view of the

3

relevant facts. Alumni has not filed a timely brief in response to St. Joseph's brief and has moved this Court for an enlargement of time to do so.

The original deadline for Alumni's appellees' brief was March 3, 2014. Alumni first moved this Court for an enlargement of time on that date, requesting the deadline be extended to March 21, 2014. We granted Alumni's motion with little objection from St. Joseph. But Alumni failed to meet this extended deadline and did not mail their appellees' brief to the Court until March 24, 2014, one working day after the deadline.[4] The clerk returned Alumni's brief, which prompted the pending motion for an enlargement of time to allow Alumni to file its appellees' brief.

When a party seeks an enlargement of time after the expiration of the time period to be enlarged, as is the case here, the Court may, in its discretion, grant the enlargement if it finds "the failure to act was the result of excusable neglect."[5] Our predecessor court has defined *excusable neglect* as "the act of a reasonably prudent person under the same circumstances."[6] Alumni's counsel attempts to show excusable neglect by citing his transcription of the incorrect date in his calendar and distraction caused by his mother's impending surgery.[7]

---

[4] March 22 and 23 constituted a weekend.

[5] CR 6.02(b).

[6] *Conlon v. Conlon*, 293 S.W.2d 710, 712 (Ky. 1956).

[7] St. Joseph is quick to point out that Alumni's counsel's mother was not scheduled to have surgery until March 25, 2014, four days after the deadline had already passed.

We are unconvinced that Alumni has shown its failure to comply with this Court's deadline was the result of excusable neglect. We cannot find that incorrectly transcribing the filing deadline, a date Alumni's counsel specifically requested when seeking the first enlargement, constitutes excusable neglect.[8] And we are likewise unconvinced that counsel's preoccupation caused by his mother's impending surgery rises to the level of excusable neglect. The surgery was scheduled to take place four days after the filing deadline for the brief, and counsel does not disclose the nature of the procedure or the precipitating condition to allow us to gauge what level of preoccupation might befall "a reasonably prudent person" in counsel's circumstances. To be sure, family medical emergencies and ongoing medical treatment may give rise to excusable neglect in some instances, but the existence of a relative's scheduled medical procedure, without more, does not precipitate the kind of neglect that excuses failure to comply with filing deadlines. Alumni's motion for an enlargement of time is, therefore, denied.

Because we have denied Alumni's motion for enlargement of time, we have no brief from Alumni filed consistently with our rules.[9] CR 76.12(8)(c) provides the range of penalties that may be levied against an appellee for failing to file a timely brief. In our discretion, we may: "(i) accept the appellant's statement of the facts and issues as correct; (ii) reverse the judgment if

---

[8] *See AK Steel Corp. v. Carico*, 122 S.W.3d 585, 586 (Ky. 2003) ("[A] misunderstanding over the filing date is not the type of excusable neglect that would enlarge the time for filing . . . .").

[9] CR 76.12(2).

5

appellant's brief reasonably appears to sustain such action; or (iii) regard the appellee's failure as a confession of error and reverse the judgment without considering the merits of the case."

St. Joseph urges us to reverse the ruling of the Court of Appeals because its brief "reasonably appears to sustain such action." Although St. Joseph's argument is not unreasonable, reversal of the decision of the Court of Appeals would result in dismissal of Alumni's underlying claim. The fault for failing to comply with the deadline ostensibly lies with Alumni's counsel, so dismissal of Alumni's cause of action seems too harsh a punishment to levy against the faultless party. We find it more appropriate to accept St. Joseph's version of the facts and issues as true. So the facts portrayed below are completely aligned with those presented by St. Joseph.

## B. The Facts and Issues Before This Court.

St. Joseph Catholic Orphan Society was founded in Louisville by several German-Catholic parishes in 1848. These parishes worked together to manage the orphanage according to the teachings of the Roman Catholic Church. St. Joseph has since incorporated, but its Catholic roots endure.

A golden cross adorns the dome atop the orphanage, and a statue of St. Joseph holding the infant Jesus stands above the main entrance. A functioning Roman Catholic chapel lies at the center of the orphanage, but St. Joseph does not proselytize or force religion upon its residents or employees.

Beyond housing and educating needy and at-risk youth, St. Joseph's Articles of Incorporation include "assist[ing] the Roman Catholic Archbishop of

6

Louisville in providing for the care, counseling, and education of children" as its mission. This principle is echoed in the preamble of its bylaws, stating that St. Joseph "operates according to the beliefs, teaching, and mission of the Catholic Church."

St. Joseph's relationship with the Roman Catholic Church is also recognized in its tax treatment. St. Joseph enjoys federal tax-exempt status based on a group exemption granted to the United States Conference of Catholic Bishops. This exemption applies to all organizations operated, supervised, or controlled by the Roman Catholic Church. St. Joseph is still required to make tax filings in light of its exempt status, but does not make the required filings on its own behalf. Instead, the Archdiocese of Louisville includes St. Joseph's documentation in its own filings. St. Joseph also successfully held itself out as a religious entity when claiming its ERISA retirement plan was a "religious plan."

The Roman Catholic Archbishop of Louisville (or his designee) is also provided a permanent seat on St. Joseph's Board of Trustees. The Board's actions are "subject to [the Archbishop's] authority in matters concerning the beliefs, teachings, and mission of the Roman Catholic Church," and the Board cannot amend its bylaws without the Archbishop's determination that the proposed amendments are not in conflict with Roman Catholic Church doctrine. The Archbishop also has the authority to invalidate *any* Board action he finds contrary to the Roman Catholic Church's beliefs, teaching, or mission.

Earl Hartlege was a member of St. Joseph's Board of Trustees when several employees accused him of harassment. In response to these allegations, the Board entertained a vote to remove Hartlege. A simple majority voted in favor of his removal, but St. Joseph's bylaws require a two-thirds majority to remove a Board member. So Hartlege was not removed.

Outraged over Hartlege's continued presence on St. Joseph's Board, some Board members[10] resigned immediately following the unsuccessful removal vote. The Archbishop withdrew his personal representative shortly thereafter, citing concern over potential liability as a result of Hartlage's alleged harassment and continued post on the Board of Trustees.

St. Joseph's annual meeting took place nearly six months after the unsuccessful attempt to remove Hartlage. During the meeting, concerned members, including the resigned Board members, proposed a resolution replacing the then-current Board members and amending St. Joseph's bylaws to include measures to protect against Board-member misconduct. The resolution passed resoundingly by a vote of 113 to 8. The Archbishop approved the resolution in full after concluding that it was not contrary to beliefs, teaching, or mission of the Roman Catholic Church.

The ousted Board members, along with the St. Joseph Home Alumni Association,[11] filed suit challenging the resolution effectuating their removal.

---

[10] Including Appellants Senn, Henry, Hillebrand, and Nopper.

[11] Although it is a named party in both this action and the underlying suit, it appears that St. Joseph Home Alumni Association is not a registered entity of any kind. This may raise questions, including its ability to prosecute a suit in its name, in

8

The Alumni alleged the resolution was ineffective because it was not passed in accord with St. Joseph's bylaws. The suit sought vacation of the amendment to St. Joseph's bylaws, an injunction preventing the newly-installed Board members from holding themselves out as St. Joseph's Board of Trustees, restoration of the Alumni to their positions on St. Joseph's Board of Trustees, and, alternatively, resumption of voting on the challenged resolution after reasonable notice to the membership of St. Joseph.

St. Joseph responded to the Alumni's complaint with a motion to dismiss, arguing, among other matters, the trial court's subject-matter jurisdiction was barred by the ecclesiastical-abstention doctrine. The trial court found the ecclesiastical-abstention doctrine inapplicable and denied St. Joseph's motion to dismiss because it concluded St. Joseph was not acting on behalf of the Roman Catholic Church when convening its annual meeting. St. Joseph then moved the trial court to stay the underlying case pending disposition of a writ proceeding adjudicating its jurisdictional challenge. St. Joseph filed its petition for writ of mandamus, and the trial court granted the requested stay.

The Court of Appeals declined to issue a writ, finding that ecclesiastical abstention does not apply in St. Joseph's case because neutral principles of secular law can be applied to resolve the dispute. This appeal followed.

---

the future, but those tentative issues are not presently before us, so we do not raise them on our own. *See Harrison v. Leach*, 323 S.W.3d 702 (Ky. 2010) (holding that issues, such as standing, that may be waived are not to be raised on an appellate court's own motion).

## II. ANALYSIS.

The issuance of a writ is an extraordinary remedy. As such, a writ may issue in only very limited circumstances:

> A writ of prohibition *may* be granted upon a showing that (1) the lower court is proceeding or is about to proceed outside of its jurisdiction and there is no remedy through an application to an intermediate court; or (2) that the lower court is acting or is about to act erroneously, although within its jurisdiction, and there exists no adequate remedy by appeal or otherwise and great injustice and irreparable injury will result if the petition is not granted.[12]

St. Joseph seeks the first class of writ, alleging the trial court was without jurisdiction to hear the underlying case by virtue of the ecclesiastical-abstention doctrine. By erroneously denying its motion to dismiss and allowing the case to proceed, the trial court, St. Joseph argues, acted outside its jurisdiction.

The standard for writs of the first class—like the one sought here—is often misconstrued to require the petitioner prove irreparable harm and the lack of an adequate remedy on appeal. We take this opportunity to reiterate those elements apply only to writs of the second class where the petitioner claims the lower court is acting erroneously but within its jurisdiction.[13]

---

[12] *Hoskins v. Maricle*, 140 S.W.3d 1, 10 (Ky. 2004).

[13] *Davis v. Wingate*, 437 S.W.3d 720, 724 (Ky. 2014); *Hoskins*, 140 S.W.3d at 9-10.

10

St. Joseph's challenge to the trial court's subject-matter jurisdiction to adjudicate the case below presents solely an issue of law, which we review de novo.[14]

## A. Ecclesiastical Abstention is not a bar to Subject-Matter Jurisdiction.

We find it prudent to determine the ecclesiastical-abstention doctrine's impact on trial court subject-matter jurisdiction before addressing the doctrine's application. Although our case law has routinely considered ecclesiastical abstention a bar to trial court jurisdiction, we have yet to analyze that doctrine in light of our jurisprudence addressing subject-matter jurisdiction. Courts in other jurisdictions have reached various conclusions when deciding the effect of ecclesiastical abstention,[15] so we find now to be an appropriate juncture to revisit our ecclesiastical-abstention precedent as it relates to the subject-matter jurisdiction of the courts of this Commonwealth.

### 1. *Kentucky's treatment of ecclesiastical abstention, though deeply rooted, is lacking a serious analysis of subject-matter jurisdiction principles.*

The ecclesiastical-abstention doctrine, discussed in greater detail below, is a mechanism employed to prevent secular courts from violating the

---

[14] *Grange Mut. Ins. Co. v. Trude*, 151 S.W.3d 803, 810 (Ky. 2004); *Lee v. George*, 369 S.W.3d 29, 33 (Ky. 2012) ("In the context of extraordinary writs, 'jurisdiction' refers not to mere legal errors but to subject-matter jurisdiction, which goes to the court's core authority to even hear cases.") (internal citations and quotation marks omitted).

[15] *See, e.g., Westbrook, Jr. v. Penley*, 231 S.W.3d 389, 394, n.3 (Tex. 2007) (noting that "[m]ost courts agree that the general prohibition on the adjudication of religious questions, once triggered, precludes further adjudication of the issue in question," and compiling cases that treat ecclesiastical abstention as "a question of justiciability," "an affirmative defense to liability," and a "subject-matter bar to jurisdiction").

11

guarantees embodied in the Establishment and Free Exercise Clauses of the First Amendment. Broadly, this doctrine prohibits secular courts from adjudicating quintessentially ecclesiastical issues, such as matters relating to faith, doctrine, and ecclesiastical governance. To be sure, the mere involvement of a church or other religious entity in a suit before a secular court does not require invocation of the ecclesiastical-abstention doctrine.

Our treatment of the ecclesiastical-abstention doctrine as a bar to subject-matter jurisdiction can be traced to the seminal case on the matter, *Marsh v. Johnson*.[16] In *Marsh*, our predecessor court held that "secular courts have no jurisdiction over ecclesiastic controversies."[17] This holding was in "recognition of the vital principle of separation of church and state" guaranteed by the First Amendment.[18] But *Marsh* failed to provide further citation or analysis explaining why that vital principle must bar jurisdiction instead of protecting First Amendment guarantees in another manner.[19]

The *Marsh* holding remained the eminent declaration of the ecclesiastical-abstention doctrine in the Commonwealth until it found a home

---

[16] 82 S.W.2d 345 (Ky. 1935).

[17] *Id.* at 346.

[18] *Id.*

[19] The *Marsh* court may have lacked a bit of precision in its use of *jurisdiction* because, due to the procedural posture of the case, the precise nature of the application of the ecclesiastical-abstention doctrine—whether a bar to jurisdiction, a form of mandatory abstention, or an affirmative defense—was irrelevant. The end result was the same: reversal of the trial court and dismissal of the cause of action.

in a more recent iteration of controlling ecclesiastical-abstention case law, *Music v. United Methodist Church.*[20]

In *Music*, a case heavily relied upon by St. Joseph, we recognized *Marsh*'s holding that secular courts are without jurisdiction to decide non-secular controversies and, citing the First and Fourteenth Amendments, held that ecclesiastical abstention preempts the subject-matter jurisdiction of Kentucky courts.[21] Unlike in *Marsh*, the precise effect of ecclesiastical abstention *did* impact the outcome of *Music*. Just as here, the issue presented in *Music* was the propriety of a writ of the first class based on the application of the ecclesiastical-abstention doctrine. A writ could only issue if ecclesiastical abstention barred the trial court's subject-matter jurisdiction. But the *Music* court neglected to analyze the impact of ecclesiastical abstention on the trial court's subject-matter jurisdiction. Its holding was instead anchored in specious citations to *Marsh* and the First and Fourteenth Amendments.[22]

The most recent of our trilogy of ecclesiastical-abstention cases is *Kirby v. Lexington Theological Seminary.*[23] *Kirby*, of course, cites *Marsh* as the starting point of our ecclesiastical-abstention jurisprudence.[24] But *Kirby* appears to soften our stance on ecclesiastical abstention operating as a bar to subject-matter jurisdiction when framing the precedential value of *Music*. We

---

[20] 864 S.W.2d 286 (Ky. 1993).

[21] *Id.* at 290.

[22] *Id.*

[23] 426 S.W.3d 597 (Ky. 2014).

[24] *Id.* at 618.

13

explained that, when faced with an ecclesiastical controversy, "*Music* stands for the proposition that secular courts must *cede* jurisdiction,"[25] implying courts retain jurisdiction in the face of the application of ecclesiastical abstention.

These cases speak in terms of *jurisdiction* and *subject-matter jurisdiction* but avoid a more robust analysis as required here. The time has come for an examination of the effect of ecclesiastical abstention through the lens of subject-matter jurisdiction principles.

### 2. Applying Principles of Subject-Matter-Jurisdiction Jurisprudence, Ecclesiastical Abstention Does not Operate to Divest Kentucky Courts of Subject-Matter Jurisdiction.

Kentucky circuit courts are courts of "general jurisdiction,"[26] meaning they "shall have original jurisdiction of *all* justiciable causes not vested in some other court."[27] This jurisdiction, and the jurisdiction challenged when seeking a writ of the first class, as St. Joseph does here, refers to the circuit court's subject-matter jurisdiction.[28] A court acts outside its jurisdiction only "where [it] has not been given, by constitutional provision or statute, the power to do anything at all."[29] In addressing the viability of a court's subject-matter

---

[25] *Id.* (emphasis added).

[26] KRS 23A.010(1).

[27] Ky. Const. § 112(5) (emphasis added).

[28] *Davis*, 437 S.W.3d at 725 ("Jurisdiction, when used here, refers to subject-matter jurisdiction . . . .").

[29] *Daugherty v. Telek*, 366 S.W.3d 463, 467 (Ky. 2012).

jurisdiction, we seek to decide "whether a court has the ability to hear 'this kind of case' instead of 'this case.'"[30]

To aid in our determination of whether ecclesiastical abstention prevents general-jurisdiction courts from hearing a broad "kind of case" or "this case" specifically, it is instructive to contemplate the analysis relevant to assessing the pertinence of ecclesiastical abstention. When addressing whether to invoke the doctrine, "[c]ourts must look not at the label placed on the action but at the actual issues the court has been asked to decide."[31] This analytical process makes clear that courts must look past the *type* of case presented and to the case-specific issues presented when contemplating the application of the ecclesiastical-abstention doctrine. There is no one *type* of case that Kentucky courts are universally unable to hear as a result of ecclesiastical abstention. Instead, when religious issues permeate distinct cases of a traditionally-recognized type, such as employment disputes, tort suits, or business-association conflicts, Kentucky courts are without authority to adjudicate that *specific* case.

That all cases where ecclesiastical abstention applies have similar characteristics, namely that they involve ecclesiastical issues, does not render them a *type* of case any more than cases invoking qualified governmental immunity are a case type for purposes of precluding circuit-court jurisdiction. We, therefore, conclude that ecclesiastical abstention does not divest Kentucky

---

[30] *Harrison*, 323 S.W.3d at 705-06 (citing *Gordon v. NKC Hospitals, Inc.*, 887 S.W.2d 360, 362 (Ky. 1994); *Duncan v. O'Nan*, 451 S.W.2d 626, 631 (Ky. 1970)).

[31] *Kirby* 426 S.W.3d at 619. (internal quotation marks and citation omitted).

15

courts of subject-matter jurisdiction because it does not render our courts unable to hear *types* of cases, only *specific* cases pervaded by religious issues. To hold otherwise would be to require all plaintiffs to plead affirmatively the inapplicability of ecclesiastical abstention in their complaint to establish proper subject-matter jurisdiction.[32]

Other courts have reached a similar conclusion when faced with this issue. The Indiana Supreme Court has held that Indiana courts, "with general authority to hear matters like employment disputes[, are] not ousted of subject matter or personal jurisdiction because the defendant pleads a religious defense."[33] Likewise, the Tenth Circuit concluded the application of the church-autonomy doctrine is not a challenge to the court's subject-matter jurisdiction, and "the assertion that the First Amendment precludes the . . . suit is similar to a government official's defense of qualified immunity."[34]

Determining what the ecclesiastical-abstention doctrine *is not*—a bar to subject-matter jurisdiction—begs the question of what it *is*. In answering this question, we find persuasive our reasoning espoused in *Kirby,* used to conclude the ministerial exception—a related doctrine also borne of the First Amendment's religion clauses—operates as an affirmative defense. We reasoned "the ministerial exception does not strip a court of its jurisdiction but,

---

[32] *Daugherty,* 366 S.W.3d at 467 ("Once filed, a court has subject matter jurisdiction of the case so long as the pleadings reveal that it is the kind of case assigned to that court by a statute or constitutional provision.").

[33] *Brazauskas v. Fort Wayne-South Bend Diocese, Inc.,* 796 N.E.2d 286, 290 (Ind. 2003).

[34] *Bryce v. Episcopal Church in the Diocese of Colorado,* 289 F.3d 648, 654 (10th Cir. 2002).

instead, simply disallows the forward progress of the particular suit."[35] This

description is particularly applicable to ecclesiastical abstention in light of our

holding above. Consistent with the logic of *Kirby*, and in recognition of the

similar purposes served by both the ministerial exception and ecclesiastical

abstention, we conclude that the ecclesiastical-abstention doctrine is an

affirmative defense.

Like other affirmative defenses recognized by this Commonwealth,

ecclesiastical abstention operates in confession and avoidance, meaning that

even assuming the plaintiff's allegations to be true, he is nonetheless not

entitled to recover. So, just as in *Kirby*, we draw an analogy to perhaps the

most commonly encountered defense of confession and avoidance, qualified

governmental immunity, and aver that the ecclesiastical-abstention defense is

to be applied in a manner that is procedurally consistent with the application

of qualified governmental immunity. Specifically, the party asserting the

ecclesiastical-abstention defense bears the burden of proving its applicability,

the applicability of the ecclesiastical-abstention defense is a question of law to

be decided by the court as a threshold matter, and the denial of ecclesiastical

abstention is "subject to prompt appellate review.[36]

---

[35] *Kirby*, 426 S.W.3d at 608.

[36] *Breathitt Cnty. Bd. of Educ. v. Prater*, 292 S.W.3d 883, 886 (Ky. 2009); *see also Kirby*, 426 S.W.3d at 609 n.45 ("Interlocutory appellate review is available—even in the absence of a final judgment—because the denial of immunity is a 'substantial claim[] of right which would be rendered moot by litigation and thus [is] not subject to meaningful review in the ordinary course following a final judgment.' *Id.* Likewise, the denial of a religious institution's assertion of the ministerial exception . . . is appropriate for interlocutory appeal.").

17

We pause to acknowledge that the ecclesiastical-abstention approach we adopt today, on our own motion, is a departure from our precedent. As the law was situated when St. Joseph was aggrieved by the trial court's unfavorable ecclesiastical-abstention ruling, our precedent dictated the only tenable avenue of redress was via a petition for a writ challenging the trial court's subject-matter jurisdiction to hear the underlying case.[37] Today, we reject that path and forge a new one in which parties similarly situated to St. Joseph—parties aggrieved by a trial court's rejection of the ecclesiastical-abstention defense—are afforded an immediate appeal instead of being forced to seek an extraordinary remedy by writ. In the end, the only difference between the method of redress we today reject and the one we replace it with is a mere technical one, which brings us to a crossroads in the present case.

We must decide whether to allow this technicality, which was not extensively argued in briefing, to win the day and mandate denial of the relief St. Joseph seeks. We find that equity and judicial economy mandate we reach the merits of St. Joseph's claim. This shift in our ecclesiastical-abstention jurisprudence was unexpected, and St. Joseph had followed the appropriate path to redress by seeking a writ. So St. Joseph's actions in pursuing this action cannot be faulted. But if we deny St. Joseph a writ without reaching the merits of its claim, it will be too late for St. Joseph to avail itself of the interlocutory review procedure we establish today. Further, if a tolling provision is found to apply allowing St. Joseph the benefit of an immediate

---

[37] *Music*, 864 S.W.2d at 290.

18

appeal, it will present the same argument, under the same standard of review—de novo—that we would decide today.  So, in contemplation of equity and judicial economy, we will consider the merits of St. Joseph's argument that the trial court erred in failing to terminate litigation on the basis of ecclesiastical abstention as if this were an interlocutory appeal.[38]

## B. The Trial Court Erred in Denying St. Joseph's Motion to Dismiss on the Basis of Ecclesiastical Abstention.

The concept of ecclesiastical abstention or church autonomy has long been recognized as a necessary corollary to the First Amendment's religion clauses.  To protect the rights embodied in the Free Exercise and Establishment Clauses of the First Amendment, ecclesiastical abstention provides "a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference—matters of church government as well as those of faith and doctrine."[39]  Thus, when resolution of a case is "dependent on the question of doctrine, discipline, ecclesiastical law, rule, or custom, or church government," secular courts must abstain from hearing the case.[40]  Put differently, "where resolution of the disputes cannot be made without extensive

---

[38] *See Bryce*, 289 F.3d at 654-55 (affirming a trial court's conversion of a motion to dismiss for lack of subject-matter jurisdiction based on ecclesiastical abstention to a motion for summary judgment).

[39] *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

[40] *Watson v. Jones*, 80 U.S. 679, 680 (1871).

inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall" not act.[41]

"At bottom, the ecclesiastical-abstention doctrine is primarily interested in preventing any chilling effect on church practices as a result of government intrusion in the form of secular courts."[42] But churches are not the only benefactors of ecclesiastical abstention. All religious organizations are entitled to protection under the First Amendment, so all suits that present an ecclesiastical character, those "which concern[] theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them" fall within the scope of the ecclesiastical-abstention doctrine.[43]

The mere inclusion of a religious organization as a party to a suit does not necessarily implicate the ecclesiastical-abstention doctrine.[44] Secular courts are not prohibited from hearing cases involving religious organizations where the dispute can be resolved by the application of neutral principles of

---

[41] *Serbian E. Orthodox Diocese for U.S. of America and Canada v. Milivojevich,* 426 U.S. 696, 709 (1976).

[42] *Kirby* 426 S.W.3d at 619.

[43] *Watson,* 80 U.S. at 733.

[44] "We reiterate that the intent of ecclesiastical abstention is not to render 'civil and property rights . . . unenforceable in the civil court simply because the parties involved might be the church and members, officers, or the ministry of the church.'" *Kant v. Lexington Theological Seminary,* 426 S.W.3d 587, 596 (Ky. 2014) (quoting *Jenkins v. Trinity Evangelical Lutheran Church,* 825 N.E.2d 1206, 1212 (Ill.App. 2005)). "It must never be overlooked that the church alone has jurisdiction of communion, faith, or discipline, and the members must submit to such rules and regulations governing these matters as may be prescribed by their church, but the church does not always have exclusive jurisdiction over property or personal liberty, or over any right which it is the duty of the civil power to protect." *Thomas v. Lewis,* 6 S.W.2d 255, 257 (Ky. 1928).

20

secular law.[45] But "[t]he 'neutral principles' doctrine should not be extended to religious controversies in the area[] of church government."[46]

In its analysis of the merits of St Joseph's claim, the Court of Appeals concluded ecclesiastical abstention to be inapplicable because it found the underlying suit could be adjudicated to resolution through the application of neutral principles of law without wading into doctrinal waters. St. Joseph challenges this conclusion, arguing that this case concerns the internal governance of a religious organization, and neutral principles of law may not be applied to such cases.

We agree with St. Joseph that the neutral-principles doctrine does not extend to issues of ecclesiastical governance,[47] so we now analyze whether the suit brought by Alumni presents an issue of internal government of a religious organization. This, of course, requires a two-pronged analysis in which we must decide: (1) if the underlying suit presents an issue regarding the internal government of St. Joseph, and (2) if St. Joseph is a religious organization.

It is axiomatic that the underlying dispute is about the internal governance of St. Joseph. The crux of the controversy revolves around who is entitled to govern St. Joseph by way of their position on the Board of Trustees. Alumni's counsel conceded as much at oral argument before the Court of Appeals, and its complaint seeks removal of the current Board and

---

[45] *Kirby* 426 S.W.3d at 618 (citing *Jones v. Wolf*, 443 U.S. 595 (1979)).

[46] *Music*, 864 S.W.2d at 288.

[47] *Id.*

21

reinstatement of Alumni. It could not be clearer that this suit concerns the internal governance of St. Joseph. We are now left to decide whether St. Joseph is a religious organization.

The definition of *religious entity* is not so narrow as to apply ecclesiastical abstention only to traditional religious entities such as churches, synagogues, and mosques. Instead, purported religious organizations will be considered such "whenever that entity's mission is marked by clear or obvious religious characteristics."[48]

St. Joseph's religious mission is no more clearly described that in its Articles of Incorporation where part of its mission is to "assist the Roman Catholic Archbishop of Louisville in providing for the care, counseling, and education of children." The preamble to St. Joseph's bylaws also asserts it "operates according to the beliefs, teaching, and mission of the Catholic Church."

St. Joseph's religious identity can also be seen in its unique relationship with the Roman Catholic Archbishop of Louisville. He (or his designee) has a permanent seat on St. Joseph's Board of Trustees. The Archbishop must review any amendments to St. Joseph's bylaws to ensure that they are consistent with the "beliefs, teachings, and missions" of the Roman Catholic Church before they can be effectuated. The Archbishop is also vested with the

---

[48] *Kirby*, 426 S.W.3d at 609 (quoting *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 226 (6th Cir. 2007)).

power to invalidate unilaterally *any* action of the Board that he deems contrary to the principles of Roman Catholicism.

The campus of St. Joseph is adorned with many of the embellishments of religious symbolism expected in a religious institution, including crosses and a statue of St. Joseph and the infant Jesus prominently displayed atop the roof above the main entrance.

Other facts not necessarily relevant to show St. Joseph's religious mission but are nonetheless pertinent to show St. Joseph's general religious nature include: its tax-exempt status under the United States Conference of Catholic Bishops' group exemption; the inclusion of its tax filings in the Archdiocese tax return; and, its successful claim that its ERISA retirement plan qualified as a "religious plan."

Upon consideration of the facts before us, we are constrained to conclude that St. Joseph is a religious organization. Although there are surely countervailing facts not outlined above, any such facts are not within our reach because of Alumni's failure to file a timely brief in the record, and our requisite deference to the facts as outlined by St. Joseph.[49] Therefore, we conclude that the trial court erred by denying St. Joseph's motion to dismiss. We find applicable to the present case the ecclesiastical-abstention defense because the

---

[49] We urge the bench and bar to recognize that our conclusion that St. Joseph is a religious organization under the ecclesiastical-abstention defense is of very limited precedential value. Our inability to weigh the entire factual scenario surrounding the operation of St. Joseph has constrained us to reach the conclusion we do today. This case is not to stand for the proposition that every similarly situated orphanage or allegedly religious entity is entitled to the benefit of ecclesiastical abstention.

underlying suit unquestionably concerns the internal governance of a religious entity.

### III. CONCLUSION.

Based on the foregoing, we affirm the Court of Appeals' denial of a writ because we conclude the ecclesiastical-abstention doctrine is not a bar to subject-matter jurisdiction. But we conclude the underlying suit presents an issue of ecclesiastical governance that is subject to ecclesiastical abstention. So we reverse the trial court's denial of St. Joseph's motion to dismiss. Accordingly, this case is remanded to the trial court for entry of an order dismissing the complaint.

All sitting. All concur.

COUNSEL FOR APPELLANTS:

Walter L. Sales
Leah Rupp Smith
Joseph A. Bilby
Stoll Keenon Ogden PLLC

Charles Harding Cassis
Jennifer Kaelin Luhrs
Goldberg Simpson, LLC

The Honorable Brian Clifford Edwards
Judge, Jefferson Circuit Court, Division Eleven

COUNSEL FOR REAL PARTIES IN INTEREST:

Charles Thomas Hectus
Hectus Law Office

William Joseph Walsh IV
Buchenberger Walsh, PLLC