Roger DERMODY, Appellant

v.

PRESBYTERIAN CHURCH (U.S.A.), Appellee

NO. 2015-CA-001613-MR

Court of Appeals of Kentucky.

JULY 28, 2017; 10:00 A.M.

BRIEFS FOR APPELLANT: Stephen B. Pence, Louisville, Kentucky.

BRIEF FOR APPELLEE: John O. Sheller, Steven T. Clark, Louisville, Kentucky.

AMICUS BRIEF: Bryan H. Beauman, Lexington, Kentucky, Eric S. Baxter, Washington, DC.

BEFORE: ACREE, COMBS AND D. LAMBERT, JUDGES.

## OPINION

ACREE, JUDGE:

This appeal arises from a summary judgment in favor Presbyterian Church (U.S.A.) relating to an action claiming slander and libel brought by a former employee, Roger Dermody. Appellate review requires consideration and application of the ecclesiastical-abstention doctrine and ministerial exception. After review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Presbyterian Church (U.S.A.) (PC(USA)) is the corporate entity for the largest Presbyterian denomination in the United States. The highest ecclesiastical governing body of PC(USA) is the General Assembly which oversees five agencies, including the Presbyterian Mission Agency (PMA). The PMA is the mission and ministry agency of PC(USA). Its operations are governed by a Board and such operations must comply with the directives of the General Assembly and PC(USA)'s Constitution.[1]

Roger Dermody was ordained by the Presbyterian Church as a minister in 1997. In June 2010, PMA recruited Dermody from Bel Air Presbyterian Church in Los Angeles, California, to be the Deputy Executive Director for Missions in Louisville, Kentucky. In his position at the PMA, he had oversight of the agency's five ministry areas of missional work and their respective employees.

One of PMA's mission projects was called "1001 New Worshipping Communi-

1. PC(USA)'s major governing document is its two-part Constitution consisting of *The Book* *of Confessions* (Part I) and *The Book of Order* (Part II).

ties," and the Director of the initiative reported to Dermody. In late 2013, in what the record indicates was well-intentioned efforts to facilitate the project, several PMA staff members created and incorporated a non-profit corporation, Presbyterian Centers for New Church Innovation, Inc. (PCNCI). It is unfortunate that these efforts were not in compliance with the Church's Incorporation Policy and Criteria and lacked the General Assembly's approval.

In January 2014, in two email threads, each of which included Dermody as a participant, there was discussion of the existence of the non-profit entity, its incorporation and its pursuit of tax-exempt status. For Dermody's part, he asked why PC(USA) employee Craig Williams, one of PCNCI's incorporators, was not making his expected and regular contacts with Presbytery leadership (the Mid-Council Engagement initiative). The answer came from another PC(USA) employee and PCNCI incorporator, Eric Hoey, who explained that Williams was "running his own shop as a non-profit entity." Dermody responded, "That's what I thought but I wanted to make sure." (R. 775). Nothing in this or any part of the record indicates that Dermody inquired of Hoey or Williams as to whether, in the process of forming the non-profit entity, they had complied with PMA regulatory policy or obtained approval of the General Assembly. Dermody would later say, in response to PC(USA)'s written Employment Warning, "It never dawned on me that our staff would do something as stupid as go outside our organization and separately incorporate." (R. 753).

After incorporating PCNCI, its principals submitted grant requests to fund the project. In March 2014, $100,000.00 of PC(USA) funds were transferred to the new non-profit.

Shortly thereafter, the PMA Office of Legal Services learned of PCNCI's existence through internal control procedures. Steps were taken to end PCNCI's operations, to return the transferred funds, and to prevent an additional transfer of funds that was in progress. These events prompted PC(USA)'s internal audit and investigation of the matter.

The Audit Committee issued a Report to the PMA Board of Directors in August 2014. The Report was posted on the PC(USA) website in October 2014. The report concluded:

> The actions which led to this investigation indicate a serious lack of regard for and adherence to the established policies and procedures of the PC(USA) and PMA. The Board and PMA have a solemn fiduciary responsibility to their donors, who expect their gifts to be used wisely and in accordance with restrictions and with budgets and priorities which have been adopted appropriately. These policies are in place to safeguard these assets....
>
> An independent corporation was formed by PC(USA) employees, without PMA authorization, using a virtually identical program name and website, transferring grant funding, and planning transfer of PC(USA) employees and further grant funding to the unauthorized separate corporation. The claimed purpose was to ensure the future existence of the program without reliance on PMA budget constraints, without exposure to PMA budget cuts and without potential impact from any changes in PMA leadership.

(R. 216). The Report identified four employees who were found to have violated the Ethics Policy based upon failure to follow established and known policies in the establishment of the unauthorized corporation. Dermody, in his role atop the PMA structure, was one of the four identi-

fied. The findings as to Dermody were that he: failed to properly supervise his subordinates who created PCNCI without proper authority; failed to inform legal counsel when he learned in January 2015 of PCNCI's existence; contributed to a culture of disregard of PC(USA) policies by his subordinates; and empowered Hoey, a PMA employee with "known performance issues," to control a significant PMA initiative without proper oversight. These findings were deemed sufficient to conclude that Dermody had committed ethics violations because its Ethics Policy provides:

All funds received and administered by the PMA .... are entrusted to the organization by God through the faithful financial support of PCUSA members and friends. The highest degree of stewardship and fiduciary responsibility is expected of all employees....

Dermody received a written Employment Warning as required by the PMA Employee Handbook, Section 601. It states, in part:

Your failure to follow PMA policies and related activity was determined to be a violation of the PMA Ethics Policy. The PMA Employee Handbook, Section 706 provides: "HR will report to the respective Teacher Elder's presbytery through its stated clerk or executive presbyter any disciplinary actions for violation of the ... Ethics Policy for Employees of the PMA." Appropriate notice will be given.

(R. 749). Dermody signed the Warning acknowledging receipt in October 2014. The Warning states that the employee's signature does not indicate agreement with its content. It also includes a section captioned "Employee Remarks" where Dermody wrote that he did not believe any of his actions were unethical. (R. 754). The Warning expressly provided that PMA has an Appeal Procedure available to employees who object to such work-related actions by PMA. The record does not indicate that Dermody ever pursued such an appeal.

Dermody later provided additional response to the Warning, stating he deeply regretted the incidents and asserting he intervened immediately after he became more fully aware of the issues in March 2014. He stated the employees involved did not keep him informed of the actions they were taking, despite their duty to do so.

Dermody was placed on administrative leave in November 2014 at the recommendation of the Executive Committee of the Board while it determined the best course of action regarding his employment. His employment with PC(USA) was terminated on June 1, 2015.

Dermody brought his slander and libel action against PC(USA) on May 29, 2015, alleging the church "repeatedly and falsely published that Dermody had engaged in 'unethical' conduct...." The paragraphs in the complaint identifying the allegedly actionable language state:

(1) *Presbyterian Outlook* published a news item with a headline "that an '[i]nvestigation finds that four PC[USA] employees committed ethics violations'" and identified in the body of the article that Dermody was one of the employees (Complaint, para. 36);

(2) PC(USA) or its agents told *Presbyterian Outlook*, a Presbyterian newsletter circulated to the PC(USA) congregation, that Dermody "had committed unspecified 'ethics violations'" (Id., para. 37);

(3) A Louisville Presbyterian minister made reference in a sermon to "alleged ethics violations and the 'four men who set up the [PCNCI] corporation'" (Id., para. 38);

(4) When a colleague of Dermody contacted PC(USA) trying to reach

him, a PC(USA) employee sent the colleague "unsolicited links to. two publications detailing Dermody's alleged ethical violations. (Id., para. 39)"

PC(USA) filed its answer, as well as a motion for summary judgment, arguing the ecclesiastical-abstention doctrine and ministerial exception require the dismissal of his claims. Alternatively, it also alleged and argued that Dermody's claim is legally deficient. PC(USA) claimed it was entitled to judgment as a matter of law.

The circuit court determined:

Dermody's claim is based on PCUSA allegedly informing people outside of the governing body of the church that Dermody had committed ethical violations. Dermody was found to have violated PCUSA's ethic policies in the October 2014 written warning. Dermody objected to that finding, but signed the warning. That he disagrees with the outcome of the internal investigation does not negate the fact that he was found to have committed ethics violations. Therefore, PCUSA's statements to that affect [sic] are true.

To overcome the truth of PCUSA's statements, the Court would be required to determine if Dermody had in fact committed ethics violations. This would necessitate interpreting church doctrine and policies, which is impermissible under the Ecclesiastical Abstention Doctrine.

(R. 255-256). This appeal followed.

## STANDARD OF REVIEW

Our review of the circuit court's decision to grant summary judgment is *de novo.*

*Harstad v. Whiteman,* 338 S.W.3d 804, 809 (Ky. App. 2011). In doing so, we must ascertain "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft,* 916 S.W.2d 779, 781 (Ky. App. 1996); CR [2] 56.03. "The moving party bears the initial burden of showing that no genuine issue of material fact exists, and then the burden shifts to the party opposing summary judgment to present" evidence establishing a triable issue of material fact. *Lewis v. B & R Corp.,* 56 S.W.3d 432, 436 (Ky. App. 2001). That is, "[t]he party opposing a properly presented summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing the existence of a genuine issue of material fact for trial." *City of Florence, Kentucky v. Chipman,* 38 S.W.3d 387, 390 (Ky. 2001).

## ANALYSIS

■ Dermody argues his claim can be resolved in his favor without any inquiry into church law, policy, or practice. He claims, therefore, the ecclesiastical-abstention doctrine does not bar his lawsuit.

■ If Dermody is correct, there must be, at the least, a genuine issue that all elements of the claim of slander or libel are capable of being proved. We listed above the alleged slanderous or libelous language Dermody identified in his complaint. To be actionable, that language must satisfy the first element of such claims—that the language be both false and defamatory.[3] A statement that is false, but not defamatory is not actionable; a

**2.** Kentucky Rules of Civil Procedure.

**3.** "The requisite elements for a defamation claim are: '(a) a false and defamatory state-

ment concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the

statement that is true is not actionable even if defamatory.

Although Dermody generally says the words expressed by PC(USA) are false, he chooses to argue more generally that "[t]he first element—defamatory language—is broadly construed [and] measured by the natural and probable effect on the mind of the average reader." (Appellant's brief, p. 10 (citations and internal quotation marks omitted)). But we must focus as well, and more particularly, on the truth or falsity of the actual statements which form the basis of Dermody's claim because, as PC(USA) argues, "[t]ruth is always a complete defense...." *Toler v. Sud–Chemie, Inc.*, 458 S.W.3d 276, 289 fn55 (Ky. 2015).

Using Dermody's own words from his complaint, the substance of the alleged slanderous or libelous statements is: (1) Dermody "had committed unspecified 'ethics violations'"; (2) "an '[i]nvestigation f[ou]nd[ ] that four PC[USA] employees [including Dermody] committed ethics violations'"; (3) a minister said there had been "alleged ethics violations [committed by] the 'four men who set up the [PCNCI] corporation'"; and (4) when a colleague of Dermody contacted the church, "a PC(USA) employee sent the colleague 'unsolicited links to two publications detailing Dermody's alleged ethical violations.'" We will consider these allegations of slander or libel in reverse order.

■ Referring someone to a website link is not actionable as libel without allegation of what that link says. Dermody

does not tell us. We need look no further than the complaint to affirm the trial court as to this specific allegation contained in paragraph 39 of the complaint. We move to the third allegation of slanderous statement.

Paragraph 38 of Dermody's complaint says a minister, in a sermon to his congregation, referred to the fact that ethics violations had been alleged against "four men who set up the [PCNCI] corporation." The Audit Report from which those allegations arose unquestionably alleged such ethics violations against four PC(USA) employees; it is also true that four PC(USA) employees were involved in setting up PCNCI.[4] Fundamental to Dermody's claim of defamation is the fact that, in truth, allegations of ethics violations were alleged against him (and others). The statements alleged in paragraph 38 of the complaint are true and, therefore, cannot be the basis of a claim of libel or slander. That takes us to Dermody's second allegation of slander or libel.

The fact, as stated in paragraph 37 of the complaint, that an investigation by PC(USA) found Dermody had committed ethics violations cannot be disputed. It is true and that is Dermody's real complaint—he objects to the ecclesiastical body's finding that he violated its ethical standards. And that leads us to his first allegation.

Dermody's first allegation of a false and defamatory statement by PC(USA), set forth in paragraph 36 of the complaint, is that he "had committed unspecified 'ethics

---

statement irrespective of special harm or the existence of special harm caused by the publication.'" *Toler v. Sud–Chemie, Inc.*, 458 S.W.3d 276, 281-82 (Ky. 2015) (quoting Restatement (Second) of Torts § 558 (1977)).

**4.** The record shows that, with Dermody's knowledge, Hoey, Williams, and PC(USA) employee, Rev. Philip Lotspeich, discussed cre-

ation of PCNCI in late 2013. (R. 759, 762-765). A fourth PC(USA) employee directly involved in PCNCI's incorporation, Tod Bolsinger, was variously identified on corporate documents and elsewhere as PCNCI's chief executive officer, president, and national director (R. 183, 791).

violations[.]." " Is this statement true or is it false? There is but one way to decide—review the determinations of an ecclesiastical body applying its own ethics rules. We cannot do that.

 The ecclesiastical-abstention doctrine prohibits courts from deciding cases "dependent on the question of doctrine, discipline, ecclesiastical law, rule, or custom, or church government[.]" [5] *St. Joseph Catholic Orphan Society v. Edwards*, 449 S.W.3d 727, 738 (Ky. 2014). Courts must avoid "unconstitutionally undertak[ing] the resolution of quintessentially religious controversies whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals[.]" *Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 618 (Ky. 2014) (quoting *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 720, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976)). However, courts need not invoke the doctrine at the mere involvement of a church or minister in an action if "neutral principles of law" can be applied in resolving the matter. *Id.* at 618-19. Under the doctrine, courts must look at the issues it has been asked to decide and determine whether they can be decided without excessive government entanglement into ecclesiastical controversies. *Id.* Ecclesiastical abstention is an affirmative defense, and "[l]ike other affirmative defenses [...] operates in confession and avoidance, meaning that even assuming the plaintiff[']s allegations to be true, he is nonetheless not entitled to recover." *St. Joseph*, 449 S.W.3d at 737.

We are not invoking the doctrine simply because this appeal involves a church. We have carefully examined the issue and have determined we cannot provide Dermody the relief he seeks without excessive government entanglement into an ecclesiastical controversy—that controversy is the disagreement between a minister and his church about what constitutes unethical conduct by one of that church's ministers.

 We are also unpersuaded by Dermody's alternative argument that we can avoid the doctrine by recasting the statements of which he complains. That is, he argues that while a statement that "Dermody had been found to violate PCUSA policy (or even its ethics policy) would be true[,]" the implication "to the general public that Dermody had acted unethically is not the same thing, and is not inherently true...." (Appellant's brief, p. 10 fn. 4). His concern is that the public, unfamiliar with PC(USA)'s superlative ethics standards, may perceive the truthful statement more broadly and as indicating greater wrongdoing than occurred. This does not strike us as a convincing argument. More importantly, he never presented such an argument to the trial court, and therefore we should not consider it now. "[A]n appellant preserves for appellate review only those issues fairly brought to the attention of the trial court.... A new theory of error cannot be raised for the first time on appeal." *Elery v. Commonwealth*, 368

---

5. Within the ecclesiastical abstention doctrine is the ministerial exception. "Simply stated, the ministerial exception is a judicially created 'principle whereby the secular courts have no competence to review the employment-related claims of ministers against their employing faith communities[.]' " *Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 605 (Ky. 2014) (quoting Mark E. Chopko & Marissa Parker, *Still a Threshold Question: Refining the Ministerial Exception Post–Hosanna–Tabor*, 10 First Amend. L.Rev. 233, 234 (Winter 2012)). Issues involving the ecclesiastical-abstention doctrine and ministerial exception are so often intertwined that application of both is necessary to resolution of a case. However, in this instance, only the application of the broader ecclesiastical abstention doctrine is presented.

S.W.3d 78, 97-98 (Ky. 2012) (internal citations and quotation marks omitted).

 Furthermore, Dermody reiterated at oral argument a rationale that was urged and rejected in *Cullen v. South East Coal Co.*, "that while the [allegedly actionable statement] was not libel per se, it was libel per quod *by innuendo.*" 685 S.W.2d 187, 190 (Ky. App. 1983) (emphasis added). However, "[w]ords (libelous per quod) require evidence of pecuniary loss arising from the use thereof...." *Id.* In effect, "[t]o establish an action for slander [or libel] per quod, a plaintiff must affirmatively prove special damages, *i.e.*, actual injury to reputation[.]" *Disabled American Veterans, Dept. of Kentucky, Inc. v. Crabb*, 182 S.W.3d 541, 547 (Ky. App. 2005) (citation and internal quotation marks omitted). Dermody made no claim in his complaint for special damages but sought damages generally only "for public embarrassment and humiliation [and] adverse effects on his future employment prospects and career, and ... for the adverse effect on his future earnings and financial stability...." (R. 13); *see Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 274 (Ky. App. 1981) ("Special damages are those beyond mere embarrassment which support actual economic loss; general damages relate to humiliation, mental anguish, etc.").

██ Additionally, "innuendo ... cannot enlarge or add to the sense or effect of the words charged to be libelous, or impute to them a meaning not warranted by the words themselves[.]" *Cullen*, 685 S.W.2d at 190 (citation and internal quotation marks omitted).

██ Summarizing, "religious institutions are free to set forth policies that align with their respective mission." *Kirby*, 426 S.W.3d at 616. Any further assessment of Dermody's defamation claim other than that we have undertaken here would constitute "government interference with an internal church decision that affects the faith and mission of the church itself." *Hosanna–Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171, 190, 132 S.Ct. 694, 707, 181 L.Ed. 2d 650 (2012). Such appellate review is prohibited by the ecclesiastical-abstention doctrine.

For the foregoing reasons, the summary judgment in favor of PC(USA) is affirmed.

LAMBERT, D., JUDGE, CONCURS.

COMBS, JUDGE, CONCURS IN A SEPARATE CONCURRING OPINION.

COMBS, JUDGE, CONCURRING:

I must concur with the majority opinion as to the ultimate outcome in this case as a matter of law. It is true that the trial court properly applied the ecclesiastical abstention doctrine, which effectively results in a kind of immunity to religious congregations in the management of their internal doctrinal affairs. It is also clear that regardless of the existence of the immunity, the tort of defamation cannot be proven because truth as to the matter at issue is an absolute defense.

However, I write separately to articulate my concern about the disregard of Dermody's reputation demonstrated by the conduct of the Presbyterian Church. Dermody is an ordained minister of the Presbyterian Church. His firing from his high administrative position within the church was admitted to have been the result of the violation of administrative policies as distinguished from any moral turpitude. His managerial abilities were placed in question—but not his fundamental character.

The generalized announcement that he was dismissed due to "ethical violations" has clearly cast a shadow over his name and presumed reputation for probity.

There was no effort to characterize his separation from employment as a result of a violation of internal administrative policy. Consequently, the nuance of serious culpability has arisen. Charges of "ethical violations" have routed governors, legislators, and judges from their public offices. This is far more than a matter of semantics.

Dermody now bears the inevitable burden of re-establishing a good name that was needlessly sullied by the church's failure to report his true shortcoming: that of being a poor manager rather than a corrupt or fallen cleric.

Despite its secure position on legal grounds, the church should have done better as a matter of conscience.