VENTERS, J., DISSENTING:
Appellant, Presbyterian Church (USA) (the Church), sought in the Court of Appeals, by way of a writ of prohibition, two forms of extraordinary relief: dismissal of the underlying action because the trial court was erroneously proceeding to adjudicate an issue of ecclesiastical polity; and prohibiting the expansive discovery allowed by the trial court into matters reaching well beyond the issue of ecclesiastical polity. The Court of Appeals granted the latter relief but denied the former and the Majority affirms that decision. Because I believe the Church was also entitled to dismissal of the case, I dissent.
Reverend Eric Hoey was a minister employed by the Church to serve as the Director of Evangelism and Church Growth for the Church's Presbyterian Ministry Agency (PMA). According to the Complaint Hoey filed in the trial court, PMA fulfills the Church's ministry and mission functions. Ultimately, Hoey's employment was terminated by the Church pursuant to its own internal disciplinary processes for ministers after the Church's governing body determined that Hoey had violated written policies set forth in the Church's Ethics Policy, contained within the Church's governing document, the Book of Order.
The Church stated the following reasons for terminating Reverend Hoey's employment: he violated the Church's written Ethics Policy; he failed to properly manage the church ministers under his supervision; and without authorization, he incorporated an independent legal entity outside the Church's organizational structure and transferred some of the Church's grant money from the PMA to that entity.[2]
According to Reverend Hoey's Complaint, Church officials, acting within the scope of their employment, said in a newsletter distributed to the Presbyterian community that he was terminated because he "had committed ethical violations and/or *182 engaged in unethical conduct." Hoey claims these statements are actionable as defamation because in his profession, violating Church ethics exposes him to "public ridicule and humiliation, ... affect[s] his future employment prospects," and otherwise exposes him to "public hatred, ridicule, contempt, or disgrace."
To establish his claim of defamation, Hoey must prove that the Church officials were lying when they said that his conduct violated the Church's ethical rules for its ministers. Toler v. Sud-Chemie, Inc., 458 S.W.3d 276, 281-82 (Ky. 2014) (A requisite element of a defamation claim is "a false and defamatory statement concerning another."). Granting Hoey the benefit of any factual dispute, and therefore, accepting as fact that Church officials said he had violated Church ethical policies, the trial court can adjudicate Hoey's claim of defamation only by evaluating those policies and determining if the Church officials' statements are true.
There is no doubt that the Church's governing body decided that Hoey had violated the policies, so adjudicating the defamation claim requires a trial process during which the judge or jury must examine the Church's ethical policies for its ministers and decide if Hoey had, indeed, violated them. In a companion lawsuit on this very same claim, the Court of Appeals has already determined that such an inquiry by a trial court violates the Ecclesiastical Abstention Doctrine. See Dermody v. Presbyterian Church (U.S.A.) , 530 S.W.3d 467, 472 (Ky. App. 2017).[3] I commend that decision to the readers of this opinion.
It is immediately apparent from the face of Hoey's Complaint that his claim can be sustained only by second-guessing the decision of the Church's governing body that Hoey violated the Church's ethical policies. The only way that Hoey can show that Church officials falsely stated that he violated the Ethical Policy contained in the Book of Order is to prove that he did not violate that policy.
I respectfully submit that only the Church can make that determination and the Government, through its courts, legislature, or executive agencies, cannot supersede that decision. No discovery at all is necessary to establish that unassailable fact; any compulsory inquiry into the matter imposed upon the Church by the Government through the Courts treads over the Free Exercise of Religion Clause. There are no "neutral principles of law," as explained below, that can be applied to resolve the matter. Hoey's complaint makes clear that any inquiries into the controversy will be "dependent on the question of doctrine, discipline, ecclesiastical law, rule, or custom, or church government [.]" Id. at 474.
The Church's governing body adjudicated that Hoey had violated specific provisions of the Church's written Ethics Policy. Based upon these adjudications, the Church determined that Hoey "had committed ethical violations and/or engaged in unethical conduct." A refutation of those adjudications would require our secular courts to engage in a review and critique of the Church's underlying religious values and doctrines, an undertaking specifically precluded by the Ecclesiastical Abstention Doctrine. Id. at 472. And because the Church's adjudications are not subject to such refutation in a secular court setting, it follows that the falsity of those adjudications may not be established in a defamation case so as to establish an indispensable element of Hoey's defamation claim.
The First Amendment Right to the Free Exercise of Religion guarantees a church's *183 authority to hire and fire its ministers at will, unfettered by government regulation.
The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.
Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C., 565 U.S. 171, 188-89, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012).
This Court has fully adopted the ministerial exception, recognizing that "the secular courts have no competence to review the employment-related claims of ministers against their employing faith communities" because the minister "is the chief instrument by which the church seeks to fulfill its purpose." Kirby v. Lexington Theological Seminary, 426 S.W.3d 597, 605 (Ky. 2014) (quotations marks and internal citations omitted). The "law should not be construed to govern the relationship of a church and its ministers." Id. (citation omitted). Kentucky courts have long honored the belief, known as the doctrine of ecclesiastical abstention, that the true "Free Exercise of Religion" compels the courts to stay out of intra-church disputes based upon the church's rules of faith and practice.
We emphasized in Kirby.
It would be difficult for the ecclesiastical abstention doctrine to be more clearly expressed than in such matters relating to the faith and practice of the church and its members, the decision of the church court is not only supreme, but is wholly without the sphere of legal or secular judicial inquiry. Separation of church and state, being a vibrant principle historically in this Commonwealth, requires that the secular courts have no jurisdiction[4] over ecclesiastical controversies and will not interfere with religious judicature or with any decision of a church tribunal relating to its internal affairs, as in matters of discipline or excision, or of purely ecclesiastical cognizance.
Id. at 618 (internal quotations marks and citations omitted) (emphasis added).
Only when a dispute hinges upon "neutral principles of law" can the Court of Justice intercede. Id. "Neutral principles of law" means conventional legal principles and theories requiring "no inquiry into religious doctrine." Jones v. Wolf, 443 U.S. 595, 603, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). Such principles are:
completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts [such as] trust and property law familiar to lawyers and judges. It thereby promises *184 to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice.
Id.
In light of Hosanna-Tabor and Kirby, there is no doubt that Reverend Hoey is precluded by the Ecclesiastical Abstention Doctrine and the ministerial exception from asserting a claim of wrongful termination based upon the Church's decision that he violated Church ethical rules. Neither the Court of Justice nor any branch of the secular government has the authority to intrude upon the validity of the Church's decision about the meaning of its minister's Ethics Policy and the conduct that constitutes a violation. In a matter "relating to the faith and practice of the church and its members, the decision of the church court is not only supreme but is wholly without the sphere of legal or secular judicial inquiry." Kirby, 426 S.W.3d at 618.[5] This matter relates to the faith and practice of the Church's ministry.
It is absurd to hold that the Church could not be sued for firing Hoey because it falsely found him in violation of Presbyterian ethical policy, while inconsistently holding that the Church can be sued for falsely saying he was fired for violating Presbyterian ethical policy. Hoey cannot circumvent the foregoing Free Exercise principles by demanding secular court intrusion into the validity of the Church's interpretation and application of its own Ethics Policy for its ministers, and the validity of the disciplinary measures of its ministers, by simply recasting the same claim as defamation rather than wrongful termination when no neutral principle of law is relied upon.
If the Church's governing body determined that Hoey's conduct violated Church policy, the Church cannot be subjected to a defamation suit for saying so. And to say otherwise, that he did not violate Church ethical policy, requires the Court to re-adjudicate the Church's disciplinary decision.
The Court of Appeals erred in allowing further discovery on the applicability of the Ecclesiastical Abstention Doctrine because the applicability of the doctrine is evident on the face of the Complaint. The Church should not be required to suffer the limited intrusion allowed under this Majority Opinion into its Constitutionally-protected domain, nor should the Church bear the additional expense and burden of this additional litigation when its immunity from same is self-evident.
I respectfully submit that the Court of Appeals erred by denying the writ sought by the Church and the Majority opinion does the same. Our conventional writ standard is met because there is no remedy by way of appeal or otherwise for this judicial intrusion into what is clearly and constitutionally the Church's exclusive domain of ecclesiastical polity. For that reason, I respectfully dissent.
Cunningham and VanMeter, JJ., join.

The funds were later restored to the PMA.

The rationale expressed by the Court of Appeals in Dermody is, in my view, unassailable.

We later clarified that the term "no jurisdiction," as used here, refers to specific case jurisdiction and is not intended to indicate that Kentucky courts lacked subject-matter jurisdiction. St. Joseph Catholic Orphan Society v. Edwards, 449 S.W.3d 727, 736 (Ky. 2014).

Quoting Marsh v. Johnson, 259 Ky. 305, 82 S.W.2d 345 (1935) (Overruled on other grounds by St. Joseph Catholic Orphan Society v. Edwards, 449 S.W.3d 727 (Ky. 2014) ).