Rel: March 6, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

_____

## SC-2025-0347

_____

**Ex parte Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Mt. Zion of Autauga County, Inc.**

**v.**

**Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.)**

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

**(Autauga Circuit Court: CV-24-900221)**

———————————————

**SC-2025-0361**

———————————————

**Ex parte Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Coffeeville Methodist Church**

**v.**

**Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.)**

**(Clarke Circuit Court: CV-24-900118)**

———————————————

**SC-2025-0367**

———————————————

**Ex parte Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.**

2

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Armstrong Methodist Church**

**v.**

**Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.)**

**(Macon Circuit Court: CV-24-900141)**

————————————————

**SC-2025-0426**

————————————————

**Ex parte Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Daleville First Methodist Church**

**v.**

**Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.)**

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

(Dale Circuit Court: CV-24-900175)

———————————————

SC-2025-0431

———————————————

**Ex parte Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: United Methodist Church Westview Heights, Inc.**

**v.**

**Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.)**

**(Dale Circuit Court: CV-24-900170)**

———————————————

**SC-2025-0439**

———————————————

**Ex parte Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.**

4

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

## PETITION FOR WRIT OF MANDAMUS

### (In re: Ham Chapel Methodist Church

### v.

### Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.)

### (Coffee Circuit Court: CV-24-900035)

_____

### SC-2025-0442

_____

### Ex parte Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.

## PETITION FOR WRIT OF MANDAMUS

### (In re: Crawford Methodist Church

### v.

### Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.)

5

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

(Russell Circuit Court: CV-24-900269)

_____

**SC-2025-0445**

_____

**Ex parte Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Elba United Methodist Church, Inc.**

**v.**

**Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.)**

**(Coffee Circuit Court: CV-24-900032)**

_____

**SC-2025-0462**

_____

**Ex parte Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.**

6

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

## PETITION FOR WRIT OF MANDAMUS

### (In re: Highland Park Methodist Church of Dothan

### v.

### Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.)

### (Houston Circuit Court: CV-24-900521)

_____

### SC-2025-0483
_____

### Ex parte Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.

### PETITION FOR WRIT OF MANDAMUS

### (In re: Baggett Chapel United Methodist Church

### v.

### Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.)

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

**(Conecuh Circuit Court: CV-24-900088)**

_____

**SC-2025-0514**

_____

**Ex parte Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Pleasant Hill Methodist Church**

**v.**

**Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.)**

**(Dale Circuit Court: CV-24-900169)**

_____

**SC-2025-0543**

_____

**Ex parte Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.**

8

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

## PETITION FOR WRIT OF MANDAMUS

### (In re: Trinity United Methodist Church

### v.

### Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.)

### (Autauga Circuit Court: CV-24-900224)

_____

### SC-2025-0643

_____

### Ex parte Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.

## PETITION FOR WRIT OF MANDAMUS

### (In re: Gold Hill Methodist Church

### v.

### Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.)

9

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

**(Lee Circuit Court: CV-24-900550)**

_____

**SC-2025-0720**

_____

**Ex parte Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Sunflower United Methodist Church, Inc.**

**v.**

**Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.)**

**(Washington Circuit Court: CV-24-900024)**

_____

**SC-2025-0851**

_____

**Ex parte Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.**

10

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Theodore United Methodist Church**

**v.**

**Alabama-West Florida Conference of the United Methodist Church, Inc., and the Board of Trustees of the Alabama-West Florida Conference of the United Methodist Church, Inc.)**

**(Mobile Circuit Court: CV-24-902829)**

SELLERS, Justice.[1]

The Alabama-West Florida Conference of the United Methodist Church, Inc. ("the Conference"), and its board of trustees have petitioned this Court for writs of mandamus directing the trial courts in 15 separate civil actions to vacate orders that dismissed counterclaims raised by the Conference and its board of trustees. We issue the writs.

Fifteen local United Methodist Church congregations throughout Alabama ("the local churches") commenced civil actions against the Conference, seeking to quiet title to real property on which the local

---

[1]These cases were originally assigned to another Justice on this Court; they were reassigned to Justice Sellers on December 5, 2025.

11

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

churches are located, conduct worship services, and facilitate other church activities.[2] The Conference's board of trustees joined in the actions and, along with the Conference, filed counterclaims in each action, seeking judgments declaring that the real property at issue is owned not by the local churches but instead by the Conference's board of trustees or is held in trust by the local churches for the benefit of the board of trustees and/or the Conference.

The local churches filed motions to dismiss the counterclaims, arguing that the trial court in each action lacks subject-matter jurisdiction over those counterclaims. The trial courts granted the local churches' motions to dismiss, and the Conference and its board of

---

[2]The local churches are: Mt. Zion of Autauga County, Inc.; Coffeeville Methodist Church; Armstrong Methodist Church; Daleville First Methodist Church; United Methodist Church Westview Heights, Inc.; Ham Chapel Methodist Church; Crawford Methodist Church; Elba United Methodist Church, Inc.; Highland Park Methodist Church of Dothan; Baggett Chapel United Methodist Church; Pleasant Hill Methodist Church; Trinity United Methodist Church; Gold Hill Methodist Church; Sunflower United Methodist Church, Inc.; and Theodore United Methodist Church.

12

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

trustees ("the petitioners") filed the present mandamus petitions, which were consolidated for our review.

In their motions to dismiss the petitioners' counterclaims, the local churches argued that the trial courts lack jurisdiction over those counterclaims based on the ecclesiastical-abstention doctrine, which "is grounded in the Establishment Clause and the Free Exercise Clause of the First Amendment to the United States Constitution" and "prohibits civil courts from adjudicating disputes concerning spiritual or ecclesiastical matters." Ex parte Alabama-W. Fla. Conf. of United Methodist Church, Inc., 401 So. 3d 1123, 1126 (Ala. 2024) ("Harvest Church"). According to the petitioners, however, the trial courts in these actions must resolve the petitioners' counterclaims because, the petitioners say, those counterclaims do not raise spiritual or ecclesiastical disputes and instead can be resolved based on "neutral principles of law." Id. at 1133.[3]

_____

[3]In support of their claims to the real property at issue, the petitioners rely on what they describe as secular real-property materials, such as deeds, corporate documents, and trust provisions. The parties have described the 15 independent civil actions involved in these

13

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

As an initial matter, the local churches oppose the idea that a mandamus petition is a proper procedural vehicle for challenging the trial courts' orders dismissing the petitioners' counterclaims; they claim that an appeal in each action will suffice. But it is undisputed that the local churches' motions to dismiss and the petitioners' mandamus petitions present an issue of the trial courts' jurisdiction, and the parties agree that, generally speaking, issues of subject-matter jurisdiction are properly considered in mandamus proceedings. See Ex parte Liberty Nat'l Life Ins. Co., 888 So. 2d 478, 480 (Ala. 2003) ("The question of subject-matter jurisdiction is reviewable by a petition for a writ of mandamus."); Ex parte Alabama-W. Fla. Conf. of United Methodist Church, Inc., [Ms. SC-2025-0259, Oct. 31, 2025] ___ So. 3d ___, ___ (Ala. 2025) ("Auburn Methodist Coalition") (indicating that the ecclesiastical-abstention doctrine implicates a court's jurisdiction and considering a mandamus petition in a dispute over church property).

_____

mandamus proceedings as being practically "identical," and there does not appear to be any assertion that 1 or more of the 15 actions should be treated any differently than the others for purposes of the mandamus petitions.

14

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

The local churches, however, suggest that mandamus review of subject-matter jurisdiction is available only when a trial court has denied a motion to dismiss that is based on an alleged lack of jurisdiction and that this Court will not consider a mandamus petition challenging a trial court's granting a motion to dismiss based on lack of jurisdiction. According to the local churches, appeals after final judgments on the local churches' quiet-title claims, which remain pending below in the early stages of litigation, will be adequate means for the petitioners to eventually challenge the trial courts' alleged errors in granting the local churches' motions to dismiss. See, generally, Ex parte Cassimus, [Ms. SC-2024-0284, Mar. 7, 2025] ___ So. 3d ___, ___ (Ala. 2025) (noting that the "general rule" is that mandamus will not lie from an order granting a motion to dismiss).

The local churches rely on Cassimus and Ex parte Lindsey, 298 So. 3d 1061, 1064 (Ala. 2020), two cases in which this Court declined to consider mandamus petitions challenging trial courts' judgments dismissing actions. But Cassimus, which involved facts substantially different than those of the present cases, considered a trial court's

15

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

granting a motion to dismiss pursuant to Alabama's abatement statute, § 6-5-440, Ala. Code 1975, which does not appear to be an issue of subject-matter jurisdiction. See Baldwin Mut. Ins. Co. v. McCain, 260 So. 3d 801, 810 (Ala. 2018) (explaining that abatement is a waivable defense that is not grounded on a lack of subject-matter jurisdiction). Lindsey involved a trial court's dismissal of some of the plaintiff's theories of liability in a legal-malpractice action because those theories failed to state a claim upon which relief could be granted. Lindsey did not involve questions of subject-matter jurisdiction.[4]

The local churches candidly acknowledge the existence of one case in which this Court at least suggested that a mandamus petition can be

---

[4]The local churches also provide a citation to Finley v. Jenkins, 264 Ala. 536, 88 So. 2d 329 (1955), which they assert held that mandamus review was unavailable because the trial court's "determination [in Finley] that it had no jurisdiction was a valid judgment for which appeal was 'a clear and adequate remedy.'" The local churches' brief at 10 (emphasis omitted). The Court in Finley, however, held that a mandamus petition filed in a circuit court, which challenged a judgment of the "Intermediate Civil Court of Birmingham" dismissing an action for lack of jurisdiction, was unavailable because the judgment of dismissal was not interlocutory and was instead a final judgment that would have supported an immediate appeal. Finley is not very helpful in the present cases.

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

a proper method for challenging a trial court's refusal to exercise jurisdiction over an action. See Ex parte Owens, 533 So. 2d 617 (Ala. 1988) (acknowledged by the local churches as affirming the Court of Civil Appeals' issuance of a writ of mandamus directing a circuit court to exercise jurisdiction over an action seeking compensation for property damage resulting from a railroad-crossing accident). For their part, the petitioners point to additional precedent that, they say, supports their position that appellate courts can consider mandamus petitions challenging a trial court's refusal to exercise jurisdiction. See Ex parte Hoye, 324 So. 3d 1271 (Ala. Civ. App. 2020) (issuing a writ of mandamus and directing the trial court to exercise its jurisdiction to enforce a settlement agreement in a divorce case); Ex parte Jones, 896 So. 2d 553 (Ala. Civ. App. 2004) (issuing a writ of mandamus and directing the family-relations division of a circuit court to exercise jurisdiction over a paternity dispute in a divorce case). The petitioners also cite the Court of Civil Appeals' decision in Ex parte CSX Transportation, Inc., 533 So. 2d 613 (Ala. Civ. App. 1987), in which that court issued a writ of mandamus directing a trial court to exercise jurisdiction over an action.

17

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

The Court of Civil Appeals' decision in CSX Transportation was the decision that this Court affirmed in Ex parte Owens, supra.

Notwithstanding the general rule that interlocutory judgments dismissing some claims in an action typically are not reviewed by a mandamus petition, our precedent does not create an absolute prohibition on mandamus review of the granting of a motion to dismiss. Simply because an issue implicated by an interlocutory order can eventually be raised on appeal does not mean that it cannot be raised in a mandamus petition. Ex parte Foremost Ins. Co., 403 So. 3d 142, 150-52 (Ala. 2024). See also Ex parte Hodge, 153 So. 3d 734, 747-49 (Ala. 2014) (indicating that the availability of an eventual appeal does not necessarily mean that that remedy is "adequate" for purposes of determining the availability of mandamus relief and noting that, "[a]lthough characterized as an extraordinary writ, this Court has repeatedly recognized that mandamus may be appropriate in disputes over subject-matter jurisdiction [and other specifically listed matters]," id. at 749).

18

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

The petitioners note that, usually, when "a trial court grants a motion to dismiss for lack of subject-matter jurisdiction, the case is typically over and therefore reviewed by way of a final appeal with no need for a mandamus." Petitioners' reply brief at 15 (emphasis omitted). But that is not the case here. In these consolidated cases, the petitioners' compulsory counterclaims in 15 different actions were dismissed, while the local churches' claims remain pending. The trial courts' orders applied only to the compulsory counterclaims and did not effect a dismissal of the actions that would give rise to appeals. If mandamus relief is not available in these cases, the question of subject-matter jurisdiction over the petitioners' counterclaims, which appear for the most part to be allegedly supported by the same sort of secular materials upon which the local churches rely in support of their quiet-title actions, will not be considered until after the parties and the trial courts in each action are, respectively, required to litigate and to preside over the local churches' claims to their final resolution.

At play here is the substantial possibility of significantly wasting the litigants' and the trial courts' time and resources. The unique

19

circumstances of these cases justify consideration of the jurisdictional issue now. See Ex parte Volkswagenwerk Aktiengesellschaft, 443 So. 2d 880, 882 (Ala. 1983) (noting that, even in situations in which this Court typically would not consider an issue via a mandamus petition, the Court will do so when the issues "raise[] matters of substantial importance"); Ex parte Moore, 382 So. 2d 548, 550 (Ala. 1980) ("'As a general rule, mandamus does not lie where there is another plain, speedy, and adequate remedy available. The remedy which will supersede mandamus may be described in general terms as one competent to afford relief on the very subject matter in question, and which is equally convenient, beneficial, and effectual. 55 C.J.S. Mandamus § 17(b).'" (citation omitted)). Cf. Dorrough v. McKee, 264 Ala. 663, 667, 89 So. 2d 77, 80 (1956) ("We do not ordinarily entertain a petition or motion for mandamus to review a ruling of the trial court on the sufficiency of a plea in abatement, which is subject to review on appeal from a final decree. But we have done so when adequate relief was not available on appeal from the final decree.").

Mandamus is an extraordinary writ that will issue

> "'where there is (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court.' Ex parte Integon Corp., 672 So. 2d 497, 499 (Ala. 1995)."

Liberty Nat'l Life Ins. Co., 888 So. 2d at 480.

"Under the ecclesiastical abstention doctrine, Alabama courts may not adjudicate disputes that are ecclesiastical in nature, including matters of church doctrine, polity, or internal governance." Auburn Methodist Coalition, ___ So. 3d at ___. Civil courts do, however, have the power to resolve church-property disputes if they can be resolved pursuant to "neutral principles of law." Harvest Church, 401 So. 3d at 1133. See also Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440, 449 (1969) ("[N]ot every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property.").

> "The U.S. Supreme Court recognized the right of civil courts to decide disputes concerning church property in Presbyterian

21

> Church v. Mary E.B. Hull Memorial Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed. 2d 658 (1969) and in Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc., 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed. 2d 582 (1970). Both Hull and Sharpsburg clearly indicate that civil courts have authority to decide disputes concerning church property; however, civil courts cannot resolve controversies involving religious doctrine or practice in deciding such property disputes. In other words, the courts must decide the property disputes by looking at so-called 'neutral principles of law' and not resolve the underlying controversies over religious doctrine. Hull, 393 U.S. 440 at 449, 89 S.Ct. 601, 21 L.Ed. 2d 658."

Trinity Presbyterian Church of Montgomery v. Tankersley, 374 So. 2d 861, 865-66 (Ala. 1979).

"[U]nder the 'neutral principles of law' approach, civil courts examine 'the language of the deeds, the terms of the local church charters, the state statutes governing the holding of church property, and the provisions in the constitution of the [denominational] church concerning the ownership and control of church property.'" Harvest Church, 401 So. 3d at 1132 (quoting Jones v. Wolf, 443 U.S. 595, 603 (1979)). Courts may "'examine certain religious documents, such as a church constitution, for language of trust in favor of the [denominational] church,'" as long as courts "'take special care to scrutinize the document

22

in purely secular terms, and not to rely on religious precepts.'" Id. (quoting Jones, 433 U.S. at 604). Accordingly, a plurality opinion of this Court in Haney's Chapel United Methodist Church v. United Methodist Church, 716 So. 2d 1156, 1158 (Ala. 1998), recognized that Alabama courts "will consider, in purely secular terms, the language of the deeds, the charter of the local church, any applicable state statutes, and any relevant provisions contained in the discipline of the national church as a means of adjudicating the dispute." See also Ex parte Central Alabama Conf., African Methodist Episcopal Zion Church in Am., 860 So. 2d 865, 869 (Ala. 2003) (directing a trial court to "follow the 'neutral-principles-of-law' approach and examine the deeds, the Book of Discipline, and other extrinsic evidence to help settle the current property dispute").

In the present cases, the petitioners rely on secular materials in support of their counterclaims, which appear to be the same secular materials upon which the local churches themselves rely in support of their quiet-title claims.[5] It is true that the petitioners also point to trust

_____

[5]As the petitioners point out, because the petitioners and the local churches rely for the most part on the same or similar materials in

23

provisions set out in the United Methodist Church's Book of Discipline, which is the governing document of the United Methodist Church. But that does not transform these actions from standard real-property disputes to ecclesiastical disputes. Harvest Church, 401 So. 3d at 1133 ("[T]he fact that a civil court must review '"the language of the deeds, the charter of the local church, any applicable state statutes, and any relevant provisions in the discipline of the national church"' does not transform a controversy over church property into a dispute over issues of '"religious practice or doctrine."'" (quoting Ex parte African Methodist Episcopal Zion Church, 860 So. 2d 870, 872-73 (Ala. 2003), quoting in turn Central Alabama Conf. of the African Methodist Episcopal Zion Church in Am. v. Crum, 746 So. 2d 1013, 1015 (Ala. Civ. App. 1999))). The petitioners' counterclaims, to the extent that they rely on the Book of Discipline, do not appear to require resolution of a dispute over

_____

support of their respective claims to the real property at issue and the competing claims in each action rely on the same operative facts, the trial courts' exercise of jurisdiction over the local churches' quiet-title claims would seem to conflict with the refusal to exercise jurisdiction over the petitioners' counterclaims.

24

doctrinal or ecclesiastical matters. Instead, the petitioners rely on provisions of the Book of Discipline that, they say, call for the real property at issue to be held in trust and that are referenced or implicated by deeds and other secular legal documents. In construing those provisions, the trial courts are required to examine and resolve issues of real-property and trust law, not issues of an ecclesiastical or spiritual nature. See, generally, Harvest Church, 401 So. 3d at 1132 (acknowledging that the neutral-principles-of-law approach "permits 'civil court[s] to examine certain religious documents, such as a church constitution, for language of trust in favor of the [denominational] church' but caution[ing] that 'civil court[s] must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust'" (quoting Jones, 443 U.S. at 604)).[6]

---

[6]Thus, notwithstanding the involvement of religious entities and associations, these actions essentially are ordinary quiet-title actions, which are "frequently used to fix and determine the status of title to land where some doubt or unasserted claim exists." 1 Jesse P. Evans III & J.

25

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

Aldersgate United Methodist Church of Montgomery v. Alabama-West Florida Conference of the United Methodist Church, Inc., 411 So. 3d 328 (Ala. 2024), does not call for a different conclusion. In that case,

---

Price Evans IV, Alabama Property Rights and Remedies § 10.6[a], p. 10-56 (6th ed. 2024). Relevant statutes provide that quiet-title actions may be commenced by plaintiffs who claim an interest in land. §§ 6-6-540 and 6-6-560, Ala. Code 1975. The plaintiff in such an action must identify any persons or entities known to claim competing interests in the land and name them as defendants. §§ 6-6-541 and 6-6-561, Ala. Code 1975. Defendants may answer the plaintiff's claim of interest in the land and may file counterclaims. §§ 6-5-542 and 6-5-565, Ala. Code 1975. The court in such an action must then adjudge which party or parties have ownership interests in the land, and that judgment is binding on the parties to the action. §§ 6-5-543 and 6-5-569, Ala. Code 1975. See Alabama Property Rights and Remedies, supra, at § 10.11, p. 10-109 ("The judgment should establish, fix, and determine the ownership of the plaintiff or defendant and should describe the property with particularity."). See also Pogue v. White Stone Baptist Church, 554 So. 2d 981, 983 (Ala. 1989) (involving a real-property dispute between an individual and a church, both of whom claimed ownership of the property, and concluding that, "[a]lthough the plaintiff did not present the evidence necessary to meet the statutory prerequisites of a quiet title action, the defendant Church did, in its response, clearly present evidence that entitled it to a judgment, as a matter of law, quieting title in it [based on a deed or on principles of adverse possession]"). Thus, the relevant statutes contemplate that, upon commencement of these actions by the local churches, the petitioners were entitled to make their own claims of ownership interests in the lands in question based upon secular interpretations of the deeds and other materials that may be submitted to the trial courts.

26

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

several local churches filed suit against the Conference, seeking a judgment directing the Conference to allow the local churches to vote to disaffiliate from the United Methodist Church and to retain the real property used by the local churches for worship services and other church activities. The local churches' claims were entirely grounded on a particular provision in the Book of Discipline.

> "Under the Book of Discipline – the [United Methodist Church's] governing document -- the general rule is that a local church may disaffiliate but the [United Methodist Church] retains title to the associated church property. Nevertheless, in 2019, amid increasing strife between local churches and the [United Methodist Church] over issues of sexuality, the [United Methodist Church] created an exception to that rule by enacting ¶ 2553 [of the Book of Discipline]. Under that provision, the [United Methodist Church] gave local churches a 'limited right' to vote to disaffiliate from the [United Methodist Church] and retain their property if they were disaffiliating 'for reasons of conscience' related to 'the practice of homosexuality or the ordination or marriage of self-avowed practicing homosexuals.'"

411 So. 3d at 329-30. At some point before the local churches in Aldersgate sued, the Conference enacted an additional provision requiring local churches to submit "eligibility statements" setting out the "reasons of conscience" underlying the local churches' desire to

27

disaffiliate. Id. Because judicial resolution of the action in Aldersgate would have required courts to resolve disputes of spiritual or ecclesiastical matters, subject-matter jurisdiction was lacking.

> "In order to grant the churches the relief they seek -- the right to vote on disaffiliation -- the trial court would have to survey the [United Methodist Church's ecclesiastical tribunal's] ecclesiastical decisions, interpret the doctrinal scope of ¶ 2553 of the Book of Discipline, and review Conference determinations about the religious adequacy of the churches' eligibility statements. That is, to decide any property questions, the trial court would have to adjudicate whether each of the churches had adequate 'reasons of conscience regarding ... the practice of homosexuality or the ordination or marriage of self-avowed practicing homosexuals.' ¶ 2553. Resolving those issues would 'inherently entail inquiry ... into the substantive criteria by which [courts] are supposedly to decide the ecclesiastical question' -- whether the churches' reasons of conscience were sufficient for disaffiliation under ¶ 2553."

411 So. 3d at 331 (quoting Serbian E. Orthodox Diocese for the United Sates & Canada v. Milivojevich, 426 U.S. 696, 713 (1976)).

In Aldersgate, the local churches "exclusively relied on ¶ 2553 [of the Book of Discipline], which they acknowledged is based on ecclesiastical matters." Id. at 333. In contrast, the petitioners in the

28

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

present cases offer secular, not ecclesiastical, arguments and evidence in support of their counterclaims. As the petitioners point out:

> "In contrast [to Aldersgate], in this case, [the local churches] seek[] to quiet title to the property based on the deed[s]. Likewise, Petitioners seek in their Counterclaims to quiet title to the same property based on language in the same deed[s] and other records. Petitioners' Counterclaims reference relevant provisions of the Book of Discipline only as they provide a basis for the grantor[s'] inclusion of the trust language in the deed[s], but the Counterclaims most certainly do not rely exclusively on the Book of Discipline's provisions. Unlike the claims in Aldersgate, the Counterclaims here do not request any interpretation of any ecclesiastical issue in the Book of Discipline; rather, they simply seek to quiet title or a declaratory judgment regarding the Subject Property based on real property records."

Mandamus petition in case no. SC-2025-0347 at 27 (citations to supporting materials omitted).

These actions are not analogous to Aldersgate, in which resolution of the dispositive issue turned on answering a purely ecclesiastical question. Rather, the present actions are more in line with cases like Harvest Church and the precedent discussed therein, in which disputes over church-related property could be resolved based on secular legal principles.

29

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

The trial courts in these cases dismissed only the petitioners' counter arguments against the local churches' claims, made in the form of counterclaims supporting the petitioners' alleged interests in the real property at issue. The dismissal orders were inappropriate in actions seeking to quiet title, in which the issue to be decided is the ownership of property among competing claimants. Such actions contemplate that all parties claiming an interest in the real property in dispute will offer arguments and evidence to support their claimed superior interests in the property. Here, the trial courts' orders dismissing the petitioners' counterclaims will prevent the petitioners from proving their alleged superior claims of ownership while allowing the local churches to pursue their claims essentially unchallenged.

The trial courts erred in granting the local churches' motions to dismiss the petitioners' counterclaims based on an alleged lack of subject-matter jurisdiction. Accordingly, we grant the petitions for the writ of mandamus and direct the trial courts to vacate the orders dismissing the petitioners' counterclaims.

SC-2025-0347 -- PETITION GRANTED; WRIT ISSUED.

30

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

SC-2025-0361 -- PETITION GRANTED; WRIT ISSUED.

SC-2025-0367 -- PETITION GRANTED; WRIT ISSUED.

SC-2025-0426 -- PETITION GRANTED; WRIT ISSUED.

SC-2025-0431 -- PETITION GRANTED; WRIT ISSUED.

SC-2025-0439 -- PETITION GRANTED; WRIT ISSUED.

SC-2025-0442 -- PETITION GRANTED; WRIT ISSUED.

SC-2025-0445 -- PETITION GRANTED; WRIT ISSUED.

SC-2025-0462 -- PETITION GRANTED; WRIT ISSUED.

SC-2025-0483 -- PETITION GRANTED; WRIT ISSUED.

SC-2025-0514 -- PETITION GRANTED; WRIT ISSUED.

SC-2025-0543 -- PETITION GRANTED; WRIT ISSUED.

SC-2025-0643 -- PETITION GRANTED; WRIT ISSUED.

SC-2025-0720 -- PETITION GRANTED; WRIT ISSUED.

SC-2025-0851 -- PETITION GRANTED; WRIT ISSUED.

Cook, J., concurs.

McCool, J., and Edwards and Minor, Special Justices,* concur in the result.

Bryan, Acting C.J.,* and Mendheim, J., dissent, with opinions.

31

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

Stewart, C.J., and Shaw, Wise, and Parker, JJ., recuse themselves.

*Because four members of the Alabama Supreme Court, including the Chief Justice, recused themselves, on November 19, 2025, Acting Chief Justice Bryan appointed Judge Christy O. Edwards of the Alabama Court of Civil Appeals and Judge Richard J. Minor of the Alabama Court of Criminal Appeals to serve as Special Justices in these mandamus proceedings.

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

BRYAN, Acting Chief Justice (dissenting).

I respectfully dissent from the Court's decision to issue the writs of mandamus in these cases. The main opinion concludes that the "counterclaims" asserted by the Alabama-West Florida Conference of the United Methodist Church, Inc., and its board of trustees ("the petitioners") do not present ecclesiastical concerns that deprive the trial courts of subject-matter jurisdiction over their counterclaims. I agree with that conclusion.

However, as also explained in the main opinion, the only ground for mandamus review cited by the petitioners is their argument that the circumstances present an issue of subject-matter jurisdiction.[7] See Ex parte Liberty Nat'l Life Ins. Co., 888 So. 2d 478, 480 (Ala. 2003)("The question of subject-matter jurisdiction is reviewable by a petition for a writ of mandamus."). Obviously, this asserted basis for this Court's

---

[7]As the main opinion also notes, the petitioners' reply brief includes additional argument and citations to authority regarding the availability of mandamus review in these circumstances. However, "'"we will not consider an issue not raised in a [petitioner]'s initial brief, but raised only in its reply brief."'" Ex parte Burkes Mech., Inc., 306 So. 3d 1, 7 (Ala. 2019)(citations omitted).

33

mandamus review contradicts the petitioners' argument that their counterclaims do <u>not</u> actually present an issue of subject-matter jurisdiction. In other words, both of the petitioners' arguments cannot be true.

This tension arises from the fact that, although this Court routinely issues the writ of mandamus to <u>stop</u> a trial court from considering a claim when the trial court lacks subject-matter jurisdiction over that claim, we do not frequently use the writ to <u>require</u> a trial court to consider a claim when the trial court has determined that it lacks subject-matter jurisdiction to do so. The two scenarios present different problems.

When a trial court lacks subject-matter jurisdiction over a claim, the trial-court judge, as an official, has a ministerial "'imperative duty'" to dismiss the claim and cannot refuse to do so. See <u>Ex parte Liberty Nat'l</u>, 888 So. 2d at 480 (citation omitted). <u>See also</u> <u>State v. Property at 2018 Rainbow Drive</u>, 740 So. 2d 1025, 1029 (Ala. 1999)("'Lacking subject matter jurisdiction [a court] may take no action other than to exercise its power to dismiss the action. ... Any other action taken by a court lacking subject matter jurisdiction is null and void.'" (citation omitted)); and

34

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

State v. Webber, 892 So. 2d 869, 871 (Ala. 2004)("The petition for a writ of mandamus, if meritorious, merely prompts the appellate court to exercise its supervisory power to tell the trial judge, as an official, as distinguished from the trial court itself, to do his or her duty when that duty is so clear that there are no two ways about it.").

By contrast, when a trial-court judge dismisses a claim based on a lack of subject-matter jurisdiction, such orders do not generally reflect a similar "'refusal to'" perform "'an imperative duty'" by the trial-court judge. See Ex parte Liberty Nat'l, 888 So. 2d at 480 (citation omitted). In fact, by dismissing a claim on such grounds, the trial-court judge has, in effect, decided the opposite -- that he or she has no choice but to dismiss the claim. The trial-court judge may be wrong about that determination, but

> "[m]andamus is an extraordinary remedy and should not be granted unless the petitioner's right to relief is clear and there is no other adequate remedy. Ex parte Army Aviation Center Federal Credit Union, 477 So. 2d 379 (Ala. 1985). The right sought to be enforced must be a matter of peremptory duty and not a matter of judicial discretion. Bank of Heflin v. Miles, 294 Ala. 462, 318 So. 2d 697 (1975). The remedy of mandamus will not lie to compel a trial court to exercise its discretion in a particular manner, nor to review the trial

35

> court's proceedings for error, nor as a substitute for appeal. Ex parte Hooper, 453 So. 2d 1066 (Ala. 1984)."

Ex parte Rogers, 533 So. 2d 245, 246 (Ala. 1988).

As the main opinion notes, an appeal from a final judgment is normally an adequate remedy when a trial court dismisses an action based on a lack of subject-matter jurisdiction; therefore, the writ of mandamus is not needed for those situations. Ex parte Rogers, 533 So. 2d at 246.

Nevertheless, it remains possible that, as in these cases, trial courts will sometimes enter interlocutory orders dismissing claims or counterclaims that the trial court has determined it lacks subject-matter jurisdiction to adjudicate. However, the concern presented by that scenario generally tends to be one of imperfect judicial economy and not the impermissible use of judicial power. See ___ So. 3d at ___ ("At play here is the substantial possibility of significantly wasting the litigants' and the trial courts' time and resources.").

I acknowledge that, as recently as 2007, this Court has stated that "'[m]andamus is "proper to compel a court to perform ministerial duties

36

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

and to entertain jurisdiction."'" Cottrell v. National Collegiate Athletic Ass'n, 975 So. 2d 306, 354 (Ala. 2007)(quoting Ex parte Little, 837 So. 2d 822, 824 (Ala. 2002), quoting in turn State v. Cannon, 369 So. 2d 32, 33 (Ala. 1979))(emphasis added). However, the petitioners have not discussed this Court's precedent articulating that proposition or explained when it is appropriately applied. "'[I]t is not the function of this Court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.' Dykes v. Lane Trucking, Inc., 652 So. 2d 248, 251 (Ala. 1994)." Ex parte Guaranty Pest Control, Inc., 21 So. 3d 1222, 1228 (Ala. 2009).

In that same vein, I note that this Court does also issue the writ of mandamus to address efficiency concerns in certain contexts. See, e.g., Ex parte Employers Mut. Cas. Co., 845 So. 2d 773, 776 (Ala. 2002)("[G]overned by the particular concerns of judicial economy raised by the scenario involved here -- a trial court's pretrial decision to strike a potentially determinative affirmative defense -- we have previously issued the writ after holding that the trial court's decision was erroneous,

37

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

focusing mainly on the inherent prejudice on the petitioner."). However, it is the petitioners' burden to demonstrate that these cases fall into one of those categories. See Ex parte TruckMax, Inc., 381 So. 3d 1116, 1121 (Ala. 2023)("It is [the petitioner]'s burden to establish that such relief is appropriate here.").

Rather than identify an appropriate use of the writ of mandamus established by this Court, the petitioners have inconsistently argued that these cases present an issue of subject-matter jurisdiction, but not really. I do not regard that argument as sufficient to meet their burden under these circumstances. See Ex parte TruckMax, 381 So. 3d at 1120 n.2 ("By providing a citation to one case in which this Court engaged in mandamus review with respect to a trial court's ruling on a motion for leave to amend an answer to raise a previously omitted affirmative defense, [the petitioner] has not demonstrated that it is 'well established that the issue being raised [in this case] is appropriate for mandamus review.' [Ex parte] Gulf Health Hosps.[, Inc.], 321 So. 3d [629,] 632 [(Ala. 2020)].").

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

Accordingly, I would deny the petitions for the writ of mandamus in these cases.  Therefore, I dissent.

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

MENDHEIM, Justice (dissenting).

In my view, the counterclaims asserted by the Alabama-West Florida Conference of the United Methodist Church, Inc., and its board of trustees ("the Conference") ask our courts to wade into a doctrinal principle of the United Methodist Church ("UMC") under the guise of legal terminology. I understand the main opinion's desire to be helpful in resolving these disputes, but we cannot do so without entangling the courts in matters that are best left to the moral judgments of the parties involved. Along the way, the main opinion adopts concepts and follows precedents with respect to church disputes that I previously have noted to be erroneous. For all those reasons, I dissent.

The main opinion begins by concluding that a mandamus petition is a proper procedural vehicle for challenging the trial courts' orders dismissing the counterclaims brought by the Conference against the plaintiff churches. I agree with that conclusion, but I disagree with the main opinion's reasoning that the churches' motions to dismiss implicate subject-matter jurisdiction.

40

As I explained in my special writing in <u>Sails v. Weeks</u>, 401 So. 3d 1109, 1109 (Ala. 2024) (Mendheim, J., concurring specially), ecclesiastical abstention is not synonymous with subject-matter jurisdiction. See <u>id.</u> at 1116. That should be obvious from the terminology employed: "abstention" necessarily means that courts <u>avoid</u> the issue involved for particular reasons, not that courts lack subject-matter jurisdiction over that type of case. See, e.g., <u>Winkler v. Marist Fathers of Detroit, Inc.</u>, 500 Mich. 327, 337, 901 N.W.2d 566, 572-73 (2017) ("As its origins and operation make clear, the ecclesiastical abstention doctrine informs how civil courts must adjudicate claims involving ecclesiastical questions; it does not deprive those courts of subject matter jurisdiction over such claims."); <u>St. Joseph Catholic Orphan Soc'y v. Edwards</u>, 449 S.W.3d 727, 736-37 (Ky. 2014) ("That all cases where ecclesiastical abstention applies have similar characteristics, namely that they involve ecclesiastical issues, does not render them a <u>type</u> of case any more than cases invoking qualified governmental immunity are a case type for purposes of precluding circuit-court jurisdiction. We, therefore, conclude that ecclesiastical abstention does not divest Kentucky courts of subject-

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

matter jurisdiction because it does not render our courts unable to hear types of cases, only specific cases pervaded by religious issues.").

Because this is a delicate area of law that often involves a mixture of civil and ecclesiastical matters, not black-and-white jurisdictional determinations,[8] it is entirely possible for courts to conclude that they may consider certain claims but not others because of distinctions based on evidence or arguments. Indeed, the churches do not rely on the exact same materials in support of their claims to the subject properties that are relied upon by the Conference. The whole thrust of the churches' motions to dismiss is that the Conference's counterclaims centrally rely on the so-called "trust clause" in the UMC's Book of Discipline for asserting ownership of the properties, while the churches rely upon certain statutory law, articles of incorporation, and deeds to the properties. The churches' claims purposefully make no reference to the

---

[8]Cf. Ex parte Alabama-West Florida Conf. of United Methodist Church, Inc., 401 So. 3d 1123, 1144 (Ala. 2024) (Parker, C.J., concurring in part and concurring in the result) (noting that "church-dispute cases involving purely civil affairs rarely arise"; that "[o]n the contrary, cases that appear to be civil in nature are often ecclesiastical"; and that "[i]t is an area fraught with danger, and we should usually stay out").

42

Book of Discipline because they believe that was this Court's problem with the local churches' claims in Aldersgate United Methodist Church of Montgomery v. Alabama-West Florida Conf. of United Methodist Church, Inc., 411 So. 3d 328 (Ala. 2024) ("Aldersgate"). As Trinity United Methodist Church's complaint expressly argued, citing Aldersgate: "The Alabama Supreme Court has held that this Court may not review the Book of Discipline in resolving secular property disputes and, rather, must rely only on the secular documents (e.g. deeds, articles of incorporation, bylaws, etc.) and may not consider a religious text, like the Book of Discipline." The main opinion -- as I will discuss in more detail later in this writing -- disagrees with that argument based on a statement made in the plurality opinion in Haney's Chapel United Methodist Church v. United Methodist Church, 716 So. 2d 1156, 1158 (Ala 1998), but the main opinion cannot deny that the Conference, unlike the churches, relies on the Book of Discipline for its claims of ownership of the subject properties. Thus, the trial courts' rulings on the churches' motions to dismiss were not incongruous with their exercise of jurisdiction over the churches' claims; they simply made a legal

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

distinction based on the arguments and evidence presented by the parties -- a distinction the main opinion -- erroneously, I believe -- finds inconsequential.

But the main opinion's crucial conceptual misstep is its insistence that we may resolve these disputes because we are able to use "neutral principles of law." That conclusion relies on some of our previous cases, such as Ex parte Alabama-West Florida Conference of United Methodist Church, Inc., 401 So. 3d 1123 (Ala. 2024) ("Harvest Church"),[9] which proclaimed that

> "civil courts can properly exercise jurisdiction to adjudicate church-related disputes as long as those disputes can be resolved (1) based on 'neutral principles of law' and (2) without resolving a religious controversy (that is, an issue of '"religious practice or doctrine"'). Ex parte African Methodist Episcopal Zion Church, 860 So. 2d [870,] 872 [(Ala. 2003)] (quoting [Central Alabama Conf. of the African Methodist Episcopal Zion Church in America v.] Crum, 746 So. 2d [1013,] 1015 [(Ala. Civ. App. 1999)]) (emphasis added)."

401 So. 3d at 1133.

_____

[9]I recused myself in Harvest Church.

44

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

In his special writing in Harvest Church, then-Chief Justice Tom Parker pointedly disagreed with that test, stating:

> "I find this test similar to the Lemon test, which 'ambitiously attempted to find a grand unifying theory of the Establishment Clause, [while in later decisions the United States Supreme Court took] a more modest approach that focuses on the particular issue at hand.' American Legion v. American Humanist Ass'n, 588 U.S. 29, 60, 139 S.Ct. 2067, 204 L.Ed.2d 452 (2019) (discussing the shortcomings of the test set forth in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)). In the same way, I believe that the majority's test for determining whether we have jurisdiction in every church-dispute case is an ambitious attempt to find a grand unifying theory instead of focusing on the particular type of case at hand, which is what our more recent precedents have done."

401 So. 3d at 1140 (Parker, C.J., concurring in part and concurring in the result). Likening the test enunciated in Harvest Church to the United States Supreme Court's infamous Lemon test was not a compliment. As I noted in my special writing in Sails, the United States Supreme Court abrogated the Lemon test in Kennedy v. Bremerton School District, 597 U.S. 507 (2022), describing it as an "abstract[] and ahistorical approach to the Establishment Clause." 597 U.S. at 534. See Sails, 401 So. 3d at 1113 (Mendheim, J., concurring specially).

45

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

Indeed, in my special concurrence in Sails, I explained that the so-called "neutral-principles-of-law approach," like the Lemon test, contains a "lack of respect for religious ideas," whereas a proper understanding "of the ecclesiastical-abstention doctrine should come from a desire to protect religious freedom rather than an unfounded fear that religious ideas might taint our civil jurisprudence." 401 So. 3d at 1114. The neutral-principles-of-law approach also fails to consistently identify "what sources a court decides to consider in reaching a decision." Id. Additionally, in looking at those sources, that approach asks courts to do the impossible: interpret church practices and guidelines through a "secular" lens.

Those latter two problems -- what sources are acceptable and attempting to employ a "secular" lens to read church documents -- are readily seen in the analysis for these consolidated cases. The parties primarily argue about the Court's holding in Aldersgate. The Conference contends that this Court in Aldersgate held that the claims of the plaintiff churches in that case were subject to ecclesiastical abstention because of "the plaintiff churches' exclusive reliance on the Book of Discipline as the

46

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

basis for their claims regarding the right to vote and the lack of <u>any</u> deed or other secular property record on which a determination could be made." Petition in case no. SC-2025-0347, p. 26. In contrast, the churches in the present consolidated cases argue that in <u>Aldersgate</u> "[t]his Court held that courts may look at secular documents (such as property deeds, articles of incorporation, etc.) but may not decide a claim based solely on a provision of a religious doctrinal book." Answer, pp. 11-12.

At first glance, the parties' foregoing conclusions about what should be gleaned from <u>Aldersgate</u> seem very similar, so it is striking that the parties should differ so vehemently as to whether <u>Aldersgate</u> supports either of their positions. However, the problem is not really with the parties but, rather, with the tightrope this Court has attempted to walk in claiming that our courts may consult the UMC's Book of Discipline so long as the courts only look at its "secular" portions and not its "doctrinal" portions. As the main opinion in <u>Aldersgate</u> attempted to explain it:

> "The 'neutral principles of law' approach allows Alabama courts adjudicating church-property disputes to 'consider, <u>in purely secular terms</u>, the language of the deeds, the charter of the local church, any applicable state statutes, and <u>any relevant provisions contained in the discipline of the national</u>

47

> church' without running afoul of the First Amendment. Haney's Chapel [United Methodist Church v. United Methodist Church], 716 So. 2d [1156,] 1158 [(Ala 1998)]. But that doctrine has limits: when deciding such property disputes, civil courts 'cannot resolve controversies involving religious doctrine or practice.' [Trinity Presbyterian Church of Montgomery v.] Tankersley, 374 So. 2d [861,] 865-66 [(Ala. 1979)]."

411 So. 3d at 332 (emphasis added).

In Aldersgate, the local churches took issue with how the Conference had applied paragraph 2553 of the Book of Discipline to them. Paragraph 2553 "gave local churches a 'limited right' to vote to disaffiliate from the UMC and retain their property if they were disaffiliating 'for reasons of conscience' related to 'the practice of homosexuality or the ordination or marriage of self-avowed practicing homosexuals.'" Aldersgate, 411 So. 3d at 330. The Aldersgate Court concluded that it could not adjudicate the local churches' claims because

> "[i]n order to grant the churches the relief they seek -- the right to vote on disaffiliation -- the trial court would have to survey the [UMC's] Judicial Council's ecclesiastical decisions, interpret the doctrinal scope of ¶ 2553 of the Book of Discipline, and review Conference determinations about the religious adequacy of the churches' eligibility statements. That is, to decide any property questions, the trial court would

> have to adjudicate whether each of the churches had adequate 'reasons of conscience regarding ... the practice of homosexuality or the ordination or marriage of self-avowed practicing homosexuals.' ¶ 2553. Resolving those issues would 'inherently entail inquiry ... into the substantive criteria by which [courts] are supposedly to decide the ecclesiastical question' -- whether the churches' reasons of conscience were sufficient for disaffiliation under ¶ 2553. [Serbian Orthodox Diocese for the United States and Canada v.] Milivojevich, 426 U.S. [696,] at 713, 96 S.Ct. 2372 [(1976)]. 'But [that] is exactly the inquiry that the First Amendment prohibits. Id.'"

Id. at 331.

In the present consolidated cases, the main opinion admits that the Conference "also point[s] to trust provisions set out in the United Methodist Church's Book of Discipline, which is the governing document of the United Methodist Church." __ So. 3d at __. But we are assured that this is not a problem because

> "[t]he [Conference's] counterclaims, to the extent that they rely on the Book of Discipline, do not appear to require resolution of a dispute over doctrinal or ecclesiastical matters. Instead, the [Conference] rel[ies] on provisions of the Book of Discipline that, [it] say[s], call for the real property at issue to be held in trust and that are referenced or implicated by deeds and other secular documents. In construing those provisions, the trial courts are required to examine and resolve issues of

49

> real-property and trust law, not issues of an ecclesiastical or spiritual nature."

Id. at __ (emphasis added).

Thus, comparing the explanations provided in Aldersgate and in the main opinion here, the apparent difference between the local churches in Aldersgate relying on paragraph 2553 of the Book of Discipline for their claims and the Conference's reliance in these consolidated cases on the trust clause in the Book of Discipline for its counterclaims is that paragraph 2553 contains "doctrinal or ecclesiastical matters" but the trust clause does not because we can use "secular" real-property law and trust law to interpret and apply it. But the simplicity of that distinction belies the complexity of the assertion.

To begin with, the Book of Discipline is, first and foremost, a governing church document. See, e.g., United Methodist Church, Baltimore Ann. Conf. v. White, 571 A.2d 790, 794 (D.C. 1990) ("The Discipline of the United Methodist Church is a religious document which this court cannot construe without usurping the rights of the UMC to construe its own law."); Oklahoma Ann. Conf. of the United Methodist

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

Church, Inc. v. Timmons, 538 P.3d 163, 166 (Okla. 2023) ("The Book of Discipline includes both matters of doctrine and policy, and procedures for implementing them."); Kirby v. Lexington Theological Seminary, 426 S.W.3d 597, 618 (Ky. 2014) ("The United Methodist Church's The Book of Discipline[] [is] the denomination's official book of church law and doctrine ...."); Wisconsin Conf. Bd. of Trs. of United Methodist Church, Inc. v. Culver, 214 Wis. 2d 394, 399, 627 N.W.2d 469, 473 (Wis. 2001) ("[T]he Book of Discipline of the United Methodist Church ... sets forth the doctrinal law of the denomination."); Mills v. Standing Gen. Comm'n on Christian Unity, 39 Misc. 3d 296, 307, 958 N.Y.S.2d 880 (Sup. Ct. 2013) ("[A]djudication of Mills' claims would require this court to interpret various sections of the Book of Discipline, a constitutionally questionable endeavor at best, given the religious nature of the text.").

The Conference's counterclaims state:

"[T]he Trust Clause is an important requirement of The [Book of] Discipline and has been for 250 years. It is an essential element to the connectional nature of the UMC. ...

"....

51

"20. The [Book of] Discipline constitutes the governing law and doctrine of the UMC and the written rules by which all UMC churches worldwide operate and are governed.

"....

"25. The Trust Clause reflects the connectional and hierarchical structure of the UMC by providing that all local church properties are held in trust for and will forever be used solely for the purpose consonant with the mission of the entire UMC denomination as set forth in The [Book of] Discipline."

Despite the clearly religious nature of the Book of Discipline and the apparently pivotal role the trust clause plays in the UMC's hierarchical structure, the main opinion overlooks any ecclesiastical-abstention concerns by quoting Aldersgate's statement that "[t]he 'neutral principles of law' approach allows Alabama courts adjudicating church-property disputes to 'consider, in purely secular terms, ... any relevant provisions contained in the discipline of the national church' without running afoul of the First Amendment. Haney's Chapel, 716 So. 2d at 1158."[10] 411 So. 3d at 332.

---

[10]The quote from Haney's Chapel about courts being allowed to use "any relevant provisions contained in the discipline of the national

52

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

church" seems to have originated from a passage in <u>Jones v. Wolf</u>, 443 U.S. 595, 604 (1979), in which the United States Supreme Court stated:

> "The neutral-principles method, at least as it has evolved in Georgia, requires a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church. In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust. In addition, <u>there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body</u>. <u>Serbian Orthodox Diocese [for the United States and Canada v. Milovojevich]</u>, 426 U.S. [696,] 709 [(1976)]."

(Emphasis added.)

It is worth noting that <u>Jones</u> was decided in the wake of <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971), and its progeny, which perpetuated the "secular" distillation of law that is no longer favored. Indeed, the <u>Jones</u> majority seems to have been enamored with embracing the "neutral-principles-of-law" approach and downplaying the idea that consulting the Book of Discipline necessarily involves courts in religious controversy because the Book of Discipline sets up the doctrinal structure of the UMC. But as Justice Powell observed in his dissent in <u>Jones</u> (which was joined by three other Justices): "The constitutional documents of churches tend to be drawn in terms of religious precepts. Attempting to

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

But if the trust clause contained in the Book of Discipline is "an essential element to the connectional nature of the UMC," as the Conference states in its counterclaims, how is it not part and parcel with the UMC's religious doctrine and practice? In other words, the Conference asserts that the property of local churches being held in trust by the UMC is part of the fabric of what it means to be a UMC church. Indeed, the portion of the Book of Discipline that the Conference quotes in its counterclaims -- the trust-clause paragraph -- seems to emphasize that point:

> "23. While each local UMC church is allowed to acquire and own property in its own legal name, Para. 2501 of The [Book of] Discipline provides, in furtherance of the connectional and hierarchical structure of the UMC, that:
>
>> "'All properties of United Methodist local churches and other United Methodist agencies and institutions are held, in trust, for the benefit of the entire denomination, and ownership and usage of

read them 'in purely secular terms' is more likely to promote confusion than understanding." 443 U.S. at 612 (Powell, J., dissenting). Moreover, the Jones majority's description of "cases where ... the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property" aptly describes reliance on the trust clause and, under Jones's paradigm, would warrant abstention.

church property is subject to the Discipline. This trust requirement is an essential element of the historic policy of The United Methodist Church or its predecessor denominations or communions and has been a part of the Discipline since 1797. It reflects the connectional structure of the Church by ensuring that the property will be used solely for purposes consonant with the mission of the entire denomination as set forth in the Discipline. The trust requirement is thus a fundamental expression of United Methodism whereby local churches and other agencies and institutions within the denomination are both held accountable to and benefit from their connection with the entire worldwide Church.

" 'The United Methodist Church is organized as a connectional structure, and titles to all real and personal, tangible and intangible property held at jurisdictional, annual, or district conference levels, or by a local church or charge, or by an agency or institution of the Church, shall be held in trust for The United Methodist Church and subject to the provisions of its Discipline. Titles are not held by The United Methodist Church, but instead by the incorporated conferences, agencies, or organizations of the denomination, by boards of trustees established for the purpose of holding and administering real and personal, tangible and intangible property.'

"The [Book of] Discipline at ¶ 2501."

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

(Emphasis added.)

Thus, according to the Book of Discipline, "[t]he trust requirement is ... a fundamental expression of United Methodism." If that is true, then a court becomes entangled in the UMC's religious doctrine or practice by interpreting that paragraph of the Book of Discipline. In other words, asking a court to enforce the trust clause essentially constitutes using government power to enforce UMC doctrine. How could it be otherwise if the trust requirement is designed to "ensur[e] that the property will be used solely for purposes consonant with the mission of the entire denomination"?

However, instead of acknowledging that fact, the main opinion clings to the idea "'that "civil court[s] must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust."'" __ So. 3d at __ (quoting Harvest Church, 401 So. 3d at 1132, quoting in turn Jones v. Wolf, 443 U.S. 595, 604 (1979)). But scrutinizing a document like the Book of Discipline "in purely secular terms" is not possible because it is the foundational

organizing document of the UMC. Directing the trial courts in these cases to read the Book of Discipline through a wholly secular lens will require the trial courts to engage in doctrinal judgments because separating what is religious from what is secular in the Book of Discipline will necessarily require an understanding and appreciation of fundamental UMC religious principles, then deciding if those religious principles may be translated into wholly secular terms. Pretending to divorce the Book of Discipline from its religious nature is like saying that the United States Constitution can be interpreted apart from its role as the organizing document of federal law. It cannot be done -- at least not without violating the very "neutral principles" the Court claims to be upholding.

If the courts elect to enter this fray between local churches and a church denomination's organizing bodies, they should do so absent any reference to the Book of Discipline and its trust clause because there is no way to read that document or that paragraph "in purely secular terms." Courts should not determine whether ecclesiastical abstention applies in a case based on the false notion that there is a distinct bright

SC-2025-0347; SC-2025-0361; SC-2025-0367; SC-2025-0426; SC-2025-0431; SC-2025-0439; SC-2025-0442; SC-2025-0445; SC-2025-0462; SC-2025-0483; SC-2025-0514; SC-2025-0543; SC-2025-0643; SC-2025-0720; SC-2025-0851

line between what is "secular" and what is "religious." The main opinion expresses a contrary position, and therefore I dissent.